C & M DEVELOPERS, INC., Plaintiff-Respondent,

v.

BERBIGLIA, INC. et al., Defendants-Appellants.

Nos. KCD 29551, KCD 29602.

Missouri Court of Appeals, Western District.

June 29, 1979.

Daniel S. Millman, Kansas City, Mo., for defendant-appellant Berbiglia, Inc.

R. Dennis Wright, Daniel R. Cofran, Kansas City, Mo., for appellant Forum Restaurants, Inc.; Hillix, Brewer, Hoffhaus & Whittaker, Kansas City, Mo., of counsel.

Herbert Horowitz, Kansas City, Mo., for respondent C & M Developers Inc.; Horowitz & Shurin, P. C., Kansas City, Mo., of counsel.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

SOMERVILLE, Presiding Judge.

The litigation spawning this appeal is rich in legal diversity as garnered from a voluminous transcript and untold exhibits revealing an action by a lessor for damages for breach of a lease of real property, enforcement of a written guaranty securing the lessee's performance of the terms of the lease, and a counterclaim for alleged tortious interference with the lessee's reasonable expectancy of a business relationship pointing toward acquisition of a favorable sublease. A far ranging prologue of facts and appropriate observations will be indulged at the outset in order to elucidate the various issues which were litigated, while reserving the liberty throughout treatment of the several points raised on appeal to intersperse and elaborate upon additional facts deemed germane to resolution of the various points.

On March 1, 1971, Manfred G. Martin, as lessor, entered into a written lease with Berbiglia, Inc., as lessee, for the letting of a commercial building then yet to be constructed on certain real property located at 2919 Vivion Road, Kansas City, Missouri.

On March 30, 1971, after encountering difficulty in securing financing to construct the proposed commercial building, Martin assigned all of his "right, title and interest in and to" said lease to C & M Developers, Inc., which obtained a loan from North Hills Bank to finance construction of the proposed commercial building. As conditions to making the construction loan, North Hills Bank demanded and received (1) a written assignment dated March 31, 1971, for rents owing under said lease and (2) a written guaranty whereby Forum Restaurants, Inc., guaranteed to C & M Developers, Inc. and North Hills Bank, "jointly and severally", the "punctual and faithful performance of the terms of said lease by Berbiglia, Inc. for and during the ten year term thereof and any renewal or extension thereof." Construction of the proposed commercial building was completed in early December, 1971, and occupancy thereof by Berbiglia, Inc., as tenant under said lease, commenced on December 8, 1971. Monthly rental under the terms of the lease was "$1,250.00, payable on the first day of each month in advance." Berbiglia, Inc. occupied the commercial building until April 30, 1973, at which time it voluntarily vacated the leased premises because the volume of business it was doing at the location had not lived up to expectations. Berbiglia, Inc. stopped making rental payments after August, 1973.

Berbiglia, Inc.'s default in rental payments during the term of said lease eventually precipitated the filing of a petition in two counts in the Circuit Court of Jackson County, Missouri, by C & M Developers, Inc. (hereinafter C & M) as plaintiff against Berbiglia, Inc. (hereinafter Berbiglia) and Forum Restaurants, Inc. (hereinafter Forum) as defendants. Count I of said petition sought judgment against Berbiglia for damages for breach of contract in the prayed for amount of $37,000.00 and Count II of said petition sought judgment against Forum under the written guaranty executed by it in the prayed for amount of $37,000.00. Berbiglia, by way of answer to Count I of C & M's petition, denied that it was in default and affirmatively pleaded

that C & M (1) had wrongfully disturbed its right of "quiet" possession, and (2) had terminated said lease by leasing said premises directly to another tenant (Custom Music Corporation) without the knowledge or consent of Berbiglia. Berbiglia also filed what was captioned "Setoff, Recoupment and Counterclaim Against Plaintiff [C & M] and Defendant Martin", and Manfred G. Martin (hereinafter Martin) was made a party to the claims asserted therein pursuant to Rule 55.32(g). Berbiglia's theory of setoff or recoupment was its right to receive credit for any rental payments paid to C & M by any third party during the balance of Berbiglia's original term under the lease, and its theory of recovery under its counterclaim was that C & M and Martin tortiously interfered with a reasonable expectancy on Berbiglia's part of securing a favorable sublease of the premises from Custom Music Corporation for the balance of Berbiglia's term under its original lease with C & M.

Among innumerable stipulations entered into between the parties, the following are deemed most pertinent at the moment for giving a broad overview of the case: (1) during March of 1971 Berbiglia was a Missouri corporation whose stock was wholly owned by Forum; (2) any and all acts or transactions engaged in by Martin appertaining to the lease were done for and on behalf of both himself and C & M; (3) Count I of C & M's petition and Berbiglia's counterclaim were to be tried to a jury and Count II of C & M's petition was to be tried to the court; (4) the "sole issue" for trial in Count II was that of "Forum's defense that there was no consideration for the guaranty"; (5) in the event the court returned a verdict in favor of C & M and against Forum under Count II of C & M's petition upholding enforcement of the guaranty and the jury returned a verdict in favor of C & M and against Berbiglia under Count I of C & M's petition the court was directed and authorized to render a "joint" judgment in the same amount against Forum; (6) in the event the jury returned a verdict in favor of Berbiglia and against C & M under Count I of C & M's petition the court was authorized and directed to render and enter a judgment in favor of Forum under Count II of C & M's petition; and (7) in the event the court returned a verdict in favor of Forum and against C & M under Count II of C & M's petition the court was authorized and directed to render a judgment in favor of Forum and against C & M whether or not C & M recovered against Berbiglia under Count I of C & M's petition.

The trial court directed a verdict in favor of C & M and Martin and against Berbiglia on Berbiglia's counterclaim; a jury found in favor of C & M and against Berbiglia under Count I of C & M's petition and awarded damages totaling $41,951.00; and the court found the sole issue of "consideration for the guaranty" under Count II of C & M's petition in favor of C & M and against Forum. Per stipulation of the parties, judgment in the amount of $41,951.00 was rendered against Berbiglia and Forum "jointly and severally". A timely motion for new trial filed by Berbiglia was first overruled and then reinstated with C & M thereafter being advised that in the event it failed to make remittitur in the sum of $1,975.00 Berbiglia's motion for new trial would be sustained. C & M responded by making remittitur in the sum of $1,975.00, and the trial court responded by rendering a final judgment in the amount of $39,976.00 against Berbiglia and Forum "jointly and severally" and overruling Berbiglia's motion for new trial. Timely appeals by both Berbiglia and Forum followed.

Berbiglia and Forum, after probing all facets of this convoluted litigation at the trial court level for signs of error, retreated to four points and two points respectively in their separate briefs on appeal. The four points ultimately advanced by Berbiglia on appeal are: (1) C & M was not the real party in interest in the cause of action alleged by C & M in Count I of its petition by reason of the assignment of rents to North Hills Bank; (2) error on the part of the trial court in directing a verdict in favor of C & M and Martin and against Berbiglia on Berbiglia's counterclaim; (3) error on the part of the trial court in refusing to sustain Berbiglia's motion for a new trial

because of excessiveness of the verdict; and (4) the remittitur ordered by the trial court was "inadequate" and so beset with vagueness and uncertainty that it did not adequately cure the excessive verdict returned by the jury. The two points ultimately advanced by Forum on appeal are: (1) no consideration existed to support the guaranty as it was executed subsequent to the lease and therefore required a new and independent consideration for its support; and (2) C & M was not the "proper party" to enforce the guaranty. The various points will hereinafter be separately addressed in the order of their reference.

Berbiglia's first point, resting as it does on the contention that C & M was not the real party in interest by reason of an absolute assignment of rents due and owing under the lease to North Hills Bank, is countered by C & M's contention that it was a real party in interest as the assignment was not absolute but was merely given as collateral security for the loan made by North Hills Bank to C & M.

■■■ Rule 52.01 leads off with the positive command that "[e]very civil action shall be prosecuted in the name of the real party in interest . . .". Concomitantly, the general rule is that an absolute assignment of an entire right or interest works a divestiture of all right or interest of the assignor therein and for purposes of maintaining a civil action thereon the assignee becomes the real party in interest. *Lumbermen's Mutual Casualty Co. v. Norris Grain Co.*, 343 F.2d 670, 688 (8th Cir. 1965); *Milliken-Helm Commission Co. v. C. H. Albers Commission Co.*, 244 Mo. 38, 147 S.W. 1065, 1067 (1912); and *Guerney v. Moore*, 131 Mo. 650, 32 S.W. 1132, 1137 (1895). On the other hand, a conditional assignment made as collateral security for a debt does not work a divestiture of all right or interest of the assignor therein but, to the contrary, he retains a sufficient right or interest therein to qualify as a real party in interest for the purpose of maintaining a civil action. *Cantor v. Union Mut. Life Ins. Co.*, 547 S.W.2d 220, 226 (Mo.App.1977); *Key v. Continental Ins. Co.*, 101 Mo.App.

344, 74 S.W. 162, 166 (1903); *Hoeppner Construction Company v. United States*, 287 F.2d 108, 112 (10th Cir. 1960); *United States v. Verrier*, 179 F.Supp. 336, 341 (D.Me.1959); and *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 44 A.D.2d 887, 355 N.Y.S.2d 856, 858 (1974).

■■■ The question of whether the assignment of rents in the instant case was absolute or made as collateral security for the debt incurred by C & M with North Hills Bank takes on a status of decisional importance and priority. As cogently stated in *Wickert v. Folk*, 250 Wis. 194, 26 N.W.2d 540, 541 (1947), the term "collateral security", when used to describe evidence of a debt given by a debtor to a creditor, "is intended to express that it is not received in payment of the primary debt, and that it is not an additional right to which the creditor is absolutely entitled . . . [but] [i]t is merely a concurrent security for another debt, whether antecedent or newly created, and is designed to increase the [facilities] of the creditor to realize the principal debt which it is given to secure." Accord: *Third Nat. Bank v. Hall*, 30 Tenn.App. 586, 209 S.W.2d 46, 50 (1947); and 68 Am.Jur.2d *Secured Transactions* § 50 (1973). Parenthetically, Missouri cases of considerable vintage are to be found subscribing to the fundamental proposition that future rents can be assigned as collateral security for another debt. *John McMenamy Investment & Real Estate Co. v. Dawley*, 183 Mo.App. 1, 165 S.W. 829, 831 (1914); and *Armour Packing Co. v. Wolff & Co.*, 59 Mo.App. 665, 667–68 (1894). The instrument documenting the assignment of rents by C & M to North Hills Bank recites, inter alia, that (1) "North Hills desires *further security* for the payment of the principal of said loan and interest thereon and for the performance by C & M of all the terms, conditions and agreements on its part to be performed and which are contained in the aforementioned Promissory Note and Deed of Trust . . ." (emphasis added), (2) "[t]his assignment is to remain in full force and effect and to be binding upon the grantees, transferees, and assigns of C & M *until the indebtedness*

*secured by the said deed of trust above described shall be fully paid . . . ."* (emphasis added), and (3) "[i]t is further understood and agreed by C & M *that while this assignment is in force, C & M shall not be relieved from the performance of any of the obligations of the ownership of said Leasehold Estate . . . ."* (emphasis added). When the concept of "collateral security" embraced in *Wickert v. Folk,* supra, is juxtaposed with the quoted portions lifted from the formal instrument of assignment, the true nature of the assignment in question as "collateral security" commensurate with the indebtedness incurred by C & M with North Hills Bank becomes readily perceptible. Moreover, another matter of equally telling importance and persuasiveness for reaching this conclusion lies in the fact that the rents due and owing under the lease substantially exceed the amount of indebtedness owed by C & M to North Hills Bank. The relevant importance of facts of like tenor were emphasized in *Hoeppner Construction Company v. United States,* supra, *United States v. Verrier,* supra, and *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.,* supra.

No merit is found in Berbiglia's contention that C & M was not a real party in interest for purposes of bringing this action for damages for breach of the lease running between C & M and Berbiglia.

■ In the waning portion of its argument C & M takes an inverse approach to Berbiglia's first point by suggesting in a very casual and offhanded manner that it is devoid of merit because Berbiglia waived any objection to North Hills Bank's absence as a party to the action. After having met the principal issue head-on and disposing of it adversely to Berbiglia on the basis upon which it was tendered, no useful purpose will be served by engaging in a protracted discussion of this casually raised procedural facet. Suffice it to say, Berbiglia did not question C & M's status as a real party in interest until after the trial commenced, at which time it did so in a rather convoluted or imprecise fashion by way of an oral motion in conjunction with an exhibit, even

then neither raised any question about North Hills Bank's absence as a party nor made any effort to have North Hills Bank added as a party to the litigation. In *Cantor v. Union Mut. Life Ins. Co.,* supra, it was held that the assignor of an assignment made for purposes of collateral security retained a sufficient interest to maintain an action as a real party in interest and the assignee was a necessary, although not an indispensable, party to the action. Berbiglia made no claim below that North Hills Bank was a necessary party, much less ask for a determination under Rule 52.04 that North Hills Bank was an indispensable party. This same silence on Berbiglia's part as to North Hills Bank's status as a party prevails on appeal. Academically, a claim that one is a necessary party is subject to waiver, and a failure to raise the matter either by way of a motion under Rule 55.27 or by alleging same in a responsive pleading constitutes an effective waiver. Rule 55.-27(g); *Skidmore v. Back,* 512 S.W.2d 223, 234 (Mo.App.1974); and *DeBacker v. Forbes,* 406 S.W.2d 811, 813 (Mo.App.1966).

Next, Berbiglia faults the trial court for directing a verdict in favor of C & M and Martin and against Berbiglia on its counterclaim. First, the theory behind the cause of action asserted by Berbiglia in its counterclaim against C & M and Martin will be placed under closer scrutiny. Fairly summarized, Berbiglia's counterclaim rests upon the theory that C & M and Martin tortiously interfered with a reasonable expectancy on Berbiglia's part of securing a favorable sublease from Custom Music Corporation for the balance of Berbiglia's term under its original lease with C & M. A substantive basis for this narrow but crucial aspect of Berbiglia's pleaded theory of recovery, redress for an intentional interference with a reasonable expectancy of a valid business relationship short of the existence of a contract, is found in *Downey v. United Weather Proofing,* 363 Mo. 852, 253 S.W.2d 976, 980 (1953): "The right of recovery for inducing a breach of a contract is but one instance of the protection which the law affords against unjustified interference in business relations. An existing contract

may be a basis for greater protection, but some protection is appropriate against unjustified interference with reasonable expectancies of commercial relations even where an existing contract is lacking." Also see *Clark-Lami, Inc. v. Cord*, 440 S.W.2d 737, 741 (Mo.1969). The contours of the tort of intentional interference with a contract or valid business relationship or of an expectancy of one or the other under Missouri law are legibly traced in *Salomon v. Crown Life Ins. Co.*, 536 F.2d 1233, 1238 (8th Cir. 1976), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976): "(1) A contract or a valid business relationship or expectancy (not necessarily a contract); (2) Defendant's knowledge of the contract or relationship; (3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) The absence of justification; and (5) Damages resulting from defendant's conduct."

■ For purposes of reviewing the action taken by the trial court in directing a verdict in favor of C & M and Martin and against Berbiglia on the latter's counterclaim, it is elementary that the evidence must be viewed in the light most favorable to Berbiglia's theory of recovery and that Berbiglia be given the benefit of every reasonable favorable inference. *Mathes v. Trump*, 458 S.W.2d 297, 298 (Mo.1970); and *Kreutz v. Wolff*, 560 S.W.2d 271, 278 (Mo. App.1977). Evidence supportive of Berbiglia's theory of recovery, viewed as mentioned, runs the following course: Roger Rue, a St. Louis real estate agent representing Custom Music Corporation of the same city, contacted Berbiglia's president on July 10, 1973, and discussed the possibility of subleasing the premises leased by Berbiglia from C & M. Under the written lease Berbiglia had the right to sublet the premises. However, Berbiglia sent Rue to see Martin about the possibility of negotiating a direct lease for the premises as Rue indicated that his client was interested in leasing the premises for twenty years, which was longer than Berbiglia's unexpired term. Berbiglia's president made the necessary arrangements for Rue to meet with Martin and sent him on his way with a note of introduction. Before Rue left to see Martin he was given a thirty day option by Berbiglia to sublet the premises for $1,500.00 per month, to which was attached a copy of the principal lease. Berbiglia's president notified Martin when he called to make arrangements for Rue to see him that Rue had a thirty day option to sublet the premises for $1,500.00 per month. Rue had obtained the thirty day option because he was afraid someone would rent the premises out from under him. Martin and Rue failed to come to any agreement on July 10, 1973, and Rue apparently returned to St. Louis. On August 3, 1973, Rue returned to Kansas City and again contacted Berbiglia's president. On this occasion Rue advised Berbiglia's president that Martin was "impossible" and that his client was ready to pay the sum of $1,500.00 per month to sublease the premises from Berbiglia for the balance of its term. The upshot of this conversation was the preparation of a longhand memorandum reciting certain basic provisions to be contained in a formal sublease to be prepared for execution by Berbiglia and Custom Music Corporation. Among other things Custom Music Corporation wanted Martin to install a ten foot overhead door and an access door. There was some disagreement about the location of the doors, as to their specifications and Martin's insistence that he install them. On August 4, 1973, Berbiglia contacted its lawyers and instructed them to prepare an appropriate sublease for the purpose of subletting the premises to Custom Music Corporation for the remainder of Berbiglia's term for a rental of $1,500.00 per month. Berbiglia's lawyers proceeded to draft a sublease containing a "landlord's consent" and took the original and a suitable number of copies to Martin and obtained his "signature" at the appropriate places thereon. According to Berbiglia's lawyer, Martin read the sublease and "landlord's consent" over before affixing his signature to the original and accompanying copies. Berbiglia executed the original and required number of copies of the sublease and then forwarded them, along with the attached

"landlord's consent", to Rue in St. Louis. However, the sublease was never executed by Custom Music Corporation. On August 8, 1973, the day after he gave his written consent to the sublease, Martin went to St. Louis and negotiated a "Letter of Agreement" pointing toward the preparation and execution of a formal lease of the premises between C & M and Custom Music Corporation for a term of twenty years at a rental of $1,250.00 per month. However, a lease between C & M and Custom Music Corporation never materialized. The only evidence as to what prompted Martin to go to St. Louis on August 8, 1973, was that he did so in response to a telephone call from Rue. The upshot of all that occurred was that all negotiations between C & M and Custom Music Corporation and Berbiglia and Custom Music Corporation ultimately fell through and neither a binding lease nor a binding sublease was ever executed.

■ Berbiglia contends that the above facts unquestionably supported submission of the cause of action espoused by it in its counterclaim against C & M and Martin. At first blush Berbiglia's contention tends to strike a responsive cord. A closer analysis of the record however reveals a total absence of evidence that Martin and C & M were unjustified in engaging in separate negotiations with Custom Music Corporation under the attendant circumstances, and Berbiglia's remissness in this respect constitutes a fatal flaw in the submissibility of its counterclaim. The absence of justification is a vital component of any action predicated upon tortious interference with a valid business relationship or expectancy. One of the requisite elements under Missouri law as explicated in *Salomon v. Crown Life Ins. Co., supra,* for making such tortious interference actionable spotlights this vital component. Although a majority of jurisdictions hew to the position that a claim of justification in an action for tortious inter-

ference with a valid business relationship is in the nature of an affirmative defense which must be pleaded and proved by the defendant.[1] Missouri takes an opposite position. The polarization just mentioned is explicated in *Gerstner Electric, Inc. v. American Insurance Company,* 520 F.2d 790, 794 (8th Cir. 1975): "The Missouri law on the subject is clear. In order to recover on its claim that appellee wrongfully interfered with its Contract by inducing its breach, *appellant was compelled to prove* that appellee 'maliciously' (*i. e.,* with knowledge of the Contract and without justifiable cause) induced its breach. The absence of justification is an essential element of this cause of action." (Emphasis added.) This polarization of positions is stated with like pungency in *Pillow v. General American Life Ins. Co.,* 564 S.W.2d 276, 280 (Mo.App. 1978): "Missouri is among those states *which include as an element of the cause of action for tortious interference with contract that the acts of the defendant inducing or causing the breach of the contract be without justification.*" (Emphasis added.) As evident from *Gerstner Electric, Inc. v. American Insurance Company, supra,* under Missouri law absence of justification is equatable with malicious interference and the absence of justification is an essential element of a cause of action predicated upon tortious interference with a valid business relationship or expectancy. This being true, lack of justification is one of several elements which a party seeking recovery is "compelled to prove".

■ Assuming arguendo that Berbiglia produced sufficient evidence to establish all other requisite elements of its cause of action, the thorny issue of whether there was any evidence or reasonable favorable inference to support the essential element of lack of justification possesses an entirely different legal complexion. Getting to the heart of the matter, where is there any

1. For example see: *Thompson v. Allstate Insurance Company,* 476 F.2d 746, 748 (5th Cir. 1973); *Lowell v. Mother's Cake & Cookie Co.,* 79 Cal.App.3d 13, 144 Cal.Rptr. 664, 668 (1978); *Winn v. McCulloch Corporation,* 60 Cal.App.3d 663, 131 Cal.Rptr. 597, 602 (1976); *Griswold v. Heat Incorporated,* 108 N.H. 119, 229 A.2d 183, 188 (1967); and *Mitchell v. Aldrich,* 122 Vt. 19, 163 A.2d 833, 836 (1960).

evidence that Martin and C & M's efforts to negotiate a lease directly with Custom Music Corporation were without justification? All of the evidence touching upon this apical element, and all reasonable favorable inferences which might legitimately be drawn, are the antitheses of a lack of justification. Berbiglia actively invited Martin and C & M to negotiate directly with Custom Music Corporation's representatives for the purpose of effecting a direct lease of the premises. If Martin had been successful in doing so it would have inured to Berbiglia's benefit by measurably mitigating the exposure to damages which it brought upon itself for unilaterally breaching the lease. All of the evidence and reasonable favorable inferences drawn therefrom overwhelmingly demonstrate that Berbiglia's rationale for introducing Custom Music Corporation's representative to Martin was for the purpose just mentioned. To say the least Berbiglia is hard put to presently cry foul because Custom Music Corporation eventually concluded to neither lease nor sublease the premises. In any event, it cannot do so on the basis that Martin and C & M were unjustified in negotiating with Custom Music Corporation for a direct lease of the premises in face of the undisputed evidence that Berbiglia initiated such negotiations. Berbiglia and C & M were both vitally interested in getting a rent paying substitute tenant for the premises.

From beginning to end the essential element of lack of justification, at best, foundered in an abyss of speculation and conjecture. The trial court properly rejected submission of Berbiglia's counterclaim on such tenuous grounds. *Osterhaus v. Gladstone Hotel Corporation,* 344 S.W.2d 91, 94 (Mo. 1961); and *Titone v. Teis Construction Company,* 426 S.W.2d 665, 669 (Mo.App. 1968). Even if legally permissible to do so, the most fertile mind would be taxed beyond imagination to engage in the degree of speculation and conjecture necessary to cause one to latch onto an otherwise legally unsupportable belief that Martin and C & M were unjustified in pursuing to the end their effort to negotiate a direct lease with Custom Music Corporation. Speculation and conjecture play no part in determining the submissibility of an essential element of a cause of action, because by their very nature they lend themselves to being indulged in ad infinitum both pro and con. After excising speculation and conjecture one inescapable fact remains—the evidentiary void in Berbiglia's counterclaim with respect to proof of lack of justification was never filled directly or upon the basis of any reasonable inferences drawn from the testimony of any witness or by the introduction and admission of any exhibit. Berbiglia argues that three exhibits which it identified and offered into evidence, but which were refused by the trial court, would, if considered, support submission of its counterclaim. Berbiglia has not charged the trial court with error for refusing to admit said exhibits nor has it advanced any reason or cited any authority which would support a charge that the trial court erred in doing so. Under these circumstances, Berbiglia's circuitous effort to have the exhibits considered for the purpose of determining submissibility of its counterclaim warrants little if any appellate consideration. Suffice it to say, this court has, ex gratia, considered the exhibits in question in the context at hand and finds them to be nugatory. Bluntly put, proof that Martin and C & M were unjustified in carrying on direct negotiations with Custom Music Corporation for the purpose of obtaining a direct lease of the premises, albeit to an unsuccessful conclusion, is imbedded in nothing more than speculation and conjecture.

Berbiglia's third point invokes numerous variations of a common theme—excessiveness of the verdict. For purposes of clarity, the numerous variations will be referred to in terms of subpoints. Subpoint one: the verdict returned by the jury in the amount of $41,951.00 was excessive in that it exceeded the amount of damages claimed by C & M in Count I of its petition, namely, damages in the sum and amount of $37,000.00. Subpoint two: the verdict returned by the jury in the amount of $41,951.00 was

excessive in that it exceeded in amount that which was supported by the evidence. Subpoint three: the verdict was excessive by reason of improperly including amounts for nonrecoverable items of alleged damages. Subpoint four: the verdict was excessive in that it improperly reflected evidentially unsupported calculations advanced by opposing counsel during closing argument. Subpoint five: the verdict was excessive because certain credits which Berbiglia claimed it was entitled to were supposedly ignored by the jury during its deliberations in reaching its verdict. Subpoint six: Berbiglia's "side of the case" was "never fairly considered by the jury" and the verdict was excessive in that it was the product of bias and prejudice on the part of the jury. Unaware of any abbreviated method for disposing of Berbiglia's Hydra-like third point, it will be treated subpoint by subpoint after being preceded by an appropriate prologue.

During the course of the trial C & M was permitted to amend by interlineation various amounts of damages attributed to separate items making up the whole of the damages sought by it under Count I of its petition. However, these amendments were never reflected in the total amount of damages formally claimed by C & M in Count I of its petition, to wit, $37,000.00, which remained the same and was never amended by interlineation. The jury returned a verdict in favor of C & M and against Berbiglia in the amount of $41,951.00 which on conditional order of the trial court was reduced by remittitur to $39,976.00 and judgment in the latter amount was rendered by the trial court in favor of C & M and against Berbiglia and Forum "jointly and severally".

■ Berbiglia's first subpoint is not totally without merit, although relief short of unconditionally granting a new trial, for reasons hereinafter set forth, was appropriate. True enough a jury verdict which exceeds in amount that which is claimed in a party's petition is deemed excessive. *Acy v. Inland Security Company*, 287 S.W.2d 347, 353 (Mo.App.1956); and *Butler v. Equitable Life Assur. Soc.*, 233 Mo.App. 94, 93

S.W.2d 1019, 1027 (1936). However, if the excess is not so great as to indicate prejudice on the part of the jury, the error may be corrected by way of remittitur. *Minor v. Lillard*, 306 S.W.2d 541, 545 (Mo.1957); and *Butler v. Equitable Life Assur. Soc., supra.*

■ Berbiglia's second subpoint, that the verdict was excessive in that it exceeded in amount that which was supported by the evidence, pivots on whether Berbiglia was given proper credit for rental income received by C & M from third parties during certain periods of Berbiglia's default under the lease. A careful seining of apposite portions of the record compels the conclusion that Berbiglia was entitled to but did not receive credits in amounts totaling $1,975.00 and in the sense argued by Berbiglia the verdict rendered by the jury ($41,951.00) exceeded the amount of damages supported by the evidence by the sum and amount of $1,975.00 and exceeded the amount of damages formally claimed in Count I of C & M's petition ($37,000.00) by the sum and amount of $4,951.00.

■ At this juncture subpoints one and two lend themselves to being jointly discussed. Although the verdict returned by the jury exceeded the amount formally claimed as damages in Count I of C & M's petition and, as well, the amount supported by the evidence, the judgment rendered thereon after remittitur ($39,976.00) did not exceed in amount that which was supported by the evidence and comported with the amount of damages claimed by C & M in its petition if Count I of its petition may be viewed as having been amended by the evidence. A verdict which exceeds in amount that which is supported by the evidence may be cured by remittitur if the excess is not so great as to indicate prejudice on the part of the jury. *Sanders v. Illinois Central Railroad Company*, 364 Mo. 1010, 270 S.W.2d 731, 737 (banc 1954); and *Wandell v. Ross*, 241 Mo.App. 1189, 245 S.W.2d 689, 694 (1952). Rule 55.33(b) provides, in part, as follows: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been

raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." No objection was made by Berbiglia that any of the amounts pertaining to various items of damage were not within or were beyond the scope of the pleadings. *Arzberger v. Grant,* 500 S.W.2d 23, 27 (Mo. App.1973) and *Vitt v. Baer,* 335 S.W.2d 681, 685–86 (Mo.App.1960), although slightly inexact, factually speaking, but nevertheless sufficiently analogous, hold that the amount formally claimed as damages in a petition may be amended by the evidence.

■ Berbiglia's third subpoint, that the verdict was excessive because it included anticipatory damages, centers on damages resulting from a loss of rentals incurred by C & M by reason of having leased the premises after Berbiglia's default to another tenant at a monthly rental less than that provided for in its lease with Berbiglia. Berbiglia contends that any damages predicated on the difference in rentals beyond the date the case was tried were anticipatory in nature and nonrecoverable. Berbiglia's third subpoint is a thinly veiled attempt to attack on appeal certain evidence which was admitted during trial after an objection to its admission during trial was withdrawn. In reality, evidence underlying Berbiglia's third subpoint was admitted without objection and no error associated with its admission was preserved for purposes of appeal. *Nichols v. Blake,* 418 S.W.2d 188, 191 (Mo.1967); *Sandler v. Schmidt,* 263 S.W.2d 35, 40 (Mo.1953); and *Behlman v. City of Florissant,* 548 S.W.2d 619, 621 (Mo.App.1977). Parenthetically, *Hawkinson v. Johnston,* 122 F.2d 724, 731 (8th Cir. 1941); *cert. denied,* 314 U.S. 694, 62 S.Ct. 365, 86 L.Ed. 555 (1941), involving substantive law of Missouri, holds that where there is a breach of a lease of real property for an extended term recovery of future damages is not precluded on the theory of their being anticipatory if they are "capable of reasonable approximation."

■ Berbiglia's fourth subpoint, that the verdict was excessive in that it improperly reflected evidentially unsupported calculations advanced by opposing counsel during closing argument, represents another attempt by Berbiglia to circuitously reach an instance of alleged trial error which occurred without objection at the time and which therefore was never properly preserved for appeal. Berbiglia's poorly disguised effort to presently object to the argument of opposing counsel was waived by its failure to timely object thereto during trial. *Blevins v. Cushman Motors,* 551 S.W.2d 602, 616 (Mo. banc 1977); and *Sandy Ford Ranch, Inc. v. Dill,* 449 S.W.2d 1, 7 (Mo.1970).

■ Berbiglia's fifth subpoint, that the verdict was excessive because certain credits which it claimed it was entitled to were supposedly ignored by the jury during its deliberations in reaching its verdict, is, when put in proper posture, contradicted by the record. In particular, the genesis of this subpoint is that the jury failed to give Berbiglia proper credit for certain amounts received from a substitute tenant in excess of the rental amount owed by Berbiglia under the terms of the lease. Evidence thereof was offered and freely admitted. Notwithstanding its admission, the jury apparently rejected the notion of giving Berbiglia credit for such amounts. Put in proper perspective, C & M made no claim for damages during the period Berbiglia claims the jury supposedly ignored or refused to give it credit for rental amounts in excess of those which Berbiglia was obligated to pay under the terms of its lease. In other words, Berbiglia was attempting to offset damages by obtaining credit for rentals inuring to C & M in the future during a period in which C & M was making no claim against Berbiglia for damages. Acceptance of the rationale employed by Berbiglia would unjustly patronize Berbiglia by permitting it to extract a reward and reap a benefit by its own initial misdoing. In at least one other jurisdiction a court virtually rejected out of hand an attempt by a de-

faulting lessee to capitalize on his own misdeed under analogous circumstances. *Trick v. Eckhouse*, 82 Ind.App. 196, 145 N.E. 587, 588 (1924).

Berbiglia's sixth subpoint, that the verdict was excessive by reason of being the product of bias and prejudice on the part of the jury, is not persuasive. The dichotomy of mere excessiveness of a verdict and excessiveness of a verdict due to bias and prejudice on the part of the jury, and accepted antidotes for each, is clearly spelled out in *Blevins v. Cushman Motors, supra.* Speaking in terms of lodging objections against jury verdicts on grounds of excessiveness, the court in *Blevins* at 614–15 carefully drew the following distinction: "One is that it is merely excessive, and in that case the verdict may be cured by remittitur. The second type of objection is that the verdict is excessive as the product of bias and prejudice on the part of the jury; and in this case the excessiveness cannot be cured by remittitur, but requires a new trial." By way of further explicating excessiveness due to bias or prejudice on the part of the jury, the court in *Blevins* at 615 took pains to carefully point out that "[i]t is firmly settled that ' "the mere size of a verdict—the fact that it may be excessive—does not in and of itself establish that it was the result of bias or passion and prejudice * * *, without showing some other error committed in the trial." ' " Berbiglia castigates C & M for having had "a glorious feast at . . . [its] expense", and chastises the jury for "complying placidly with the 'evidence' supplied in . . [the] argument by counsel for . . . [C & M]", and for "slavishly . . . [adopting] the specific amounts and calculations supplied by counsel for . . . [C & M] during his closing arguments to the jury." This dramatically exceeds the bounds of subtly inferring that some degree of bias and prejudice must have crept into the jury's deliberations absent specification of any particular instance of error committed during the course of the trial which supposedly poisoned the jury's thinking against the losing party. The jury in the instant case was unfortunately confronted with complicated issues presented in a complicated manner and its verdict, to the extent it was excessive, reflected the complicated nature of the issues and the manner in which they were presented rather than a manifestation of any overt or covert bias or prejudice on its part. Evidence as to the various elements of damages was presented in dollar amounts and the damages arrived at in the verdict ultimately involved a matter of mathematical computation. As C & M has been exonerated from any charged incidence of error interspersed throughout the previous five subpoints, Berbiglia's sixth subpoint affords no relief because of its failure to establish any particular instances of error to transpose the jury's verdict from a state of mere excessiveness to a state of excessiveness occasioned by bias or prejudice on the part of the jury.

Although the verdict in the instant case was excessive in that it exceeded the amount formally claimed by C & M in Count I of its petition before being amended by the evidence and also exceeded the amount supported by the evidence, Berbiglia's failure to convincingly demonstrate that it resulted from bias and prejudice instigated by some particular instance of error committed during the course of the trial placed the verdict in the category of excessiveness that could be cured by remittitur. Such being the case, the conditional remittitur ordered by the trial court and accepted by C & M was appropriate under the circumstances and properly authorized rendition of a final judgment in the sum and amount of $39,976.00 against Berbiglia, and against Forum via the stipulation in the event it was liable under the guaranty. *Minor v. Lillard, supra; Butler v. Equitable Life Assur. Soc., supra; Sanders v. Illinois Central Railroad Company, supra; Wandell v. Ross, supra; Arzberger v. Grant, supra;* and *Vitt v. Baer, supra.*

Berbiglia's fourth and final point criticizes the remittitur ordered by the trial court for being "inadequate" and for being in the form of a "blanket, non-specific" sum. Criticism presently leveled on

grounds of inadequacy inversely attempts to rehash and reargue Berbiglia's previous charge that the verdict was excessive. It was labored over at length when directly put in issue and will not be reconsidered in its warmed-over form. Criticism leveled at the remittitur for being in the form of a "blanket, non-specific" sum rests on the hypothesis that the judgment rendered by the trial court after remittitur was vague and uncertain because of its lack of specificity as to amounts and items of damages to which the remitted sum applied. This argument is bootstrapped by the fact that in the event the jury found in favor of C & M and against Berbiglia under Count I of C & M's petition, the form of verdict given the jury to follow required it to allocate any damages awarded among four specified elements of damages. The form of the verdict embodied in Instruction No. 8 was given at the request of C & M and without objection by Berbiglia. The source of or rationale for Instruction No. 8 was never disclosed, either during trial or on appeal. Even though the parties may be said to have tacitly agreed to submit a verdict form requiring the main elements of damages to be separately stated by the jury in its verdict, with separate amounts allocated for each item, no rule or statute imposed such requirements. To the contrary, Section 510.220, RSMo 1949 (now embodied in Rule 71.01), Section 510.230, RSMo 1949 (now embodied in Rule 71.02), and Section 510.270, RSMo 1949 (now embodied in Rule 71.06), were construed as follows in *Chariton River Drainage Dist. v. Waddill*, 254 S.W.2d 991, 992 (Mo.App.1953): "The issue in the instant case was one for the recovery of money. It is only in cases involving the assessing of exemplary or punitive, as well as compensatory damages, that it is required that the respective amounts allowed for each shall be separately found and stated. In other cases the statutes do not require that the various elements of damage involved be separately stated in the jury verdict together with the amount allowed for each." Absent a requirement that the various elements of damage had to be separately found and stated by the jury in its verdict, no sound

reason exists for condemning the judgment rendered by the trial court after remittitur on grounds of vagueness and uncertainty.

■ At this juncture attention turns to the two points relied upon by Forum on appeal—(1) lack of consideration to support the guaranty and (2) that C & M was not the "proper party" to enforce the guaranty. Reverting back to the stipulation entered into between the parties regarding submission of Count II to the court for trial rather than to the jury, the same specifically provided that the "sole issue" for trial in Count II was that of "Forum's defense that there was no consideration for the guaranty". Ergo, Forum will not be permitted at this late date to broaden the issues in total disregard of the formal stipulation entered into at the trial court level. Further reasons for not permitting Forum to jump the stipulation and broaden the issues on appeal lie in the fact that Forum neither moved to have North Hills Bank added as a party at the trial court level nor makes any contention on appeal that North Hills Bank was an indispensable party within the purview of Rule 55.27(g)(2). However, the first of Forum's two points on appeal, lack of consideration to support the guaranty, having been raised at the trial level and preserved for appellate review, merits attention and disposition on a substantive basis.

■ Forum posits its first point on the settled principle that "[a] contract of guaranty, like any other contract, must be founded upon a valuable consideration . . . [and] [w]here the guaranty is executed subsequent to the principal contract, it requires a new and independent consideration." *J. R. Watkins Co. v. Smith*, 31 S.W.2d 544, 546 (Mo.App.1930). Accord: *De Lassus v. Russell*, 296 S.W. 225, 227 (Mo.App.1927). Since the guaranty in the instant case was executed subsequent to the lease, i. e. the "principal contract", Forum postulates that no consideration existed to support the guaranty as C & M was already obligated under the lease to construct and put Berbiglia into possession of the improvement and premises described in the lease. Forum has conveniently avoided any mention or

analysis of even the most basic facts, in the context of accepted principles of contract law touching upon consideration, for the purpose of determining whether or not any "new" and "independent" consideration existed to support the guaranty. To the contrary, Forum arbitrarily assumes that no "new" and "independent" consideration existed and erroneously cites *Northern State Construction Company v. Robbins*, 76 Wash.2d 357, 457 P.2d 187 (1969), as authority for its summary conclusion that the construction loan by North Hills Bank to C & M did not constitute a "new" and "independent" consideration for the guaranty. Factually, *Northern State Construction Company* and the case at bar stand in stark contrast to each other. The guaranty sued upon in *Northern State Construction Company* guaranteed performance of the obligations of a property owner to a contractor under a construction contract. The guaranty was entered into subsequent to the construction contract, and, additionally, the trier of fact found no evidence of any "new" or "independent" consideration to support it. This being the case, the court held that the contractor could not recover against the guarantor. The resume of facts set forth in *Northern State Construction Company* incidentally mentioned a second and distinctly separate guaranty wherein the same guarantor undertook to guarantee to a bank the contractor's repayment of a construction loan obtained from the bank to complete the contract. However, and this fact cannot be overemphasized, this second and distinctly separate guaranty incidentally mentioned in the resume of facts contained in *Northern State Construction Company* was not the subject of the litigation and the court neither held nor intimated by way of dictum that the second and distinctly separate guaranty was not supported by adequate consideration.

C & M does not rely upon its promises in the lease to construct a commercial building on the premises and put Berbiglia in possession thereof as consideration to support the guaranty executed by Forum. It would appear that any attempt to do so would run afoul of the widely accepted principle that a promise to carry out an already existing contractual duty of the promisor does not constitute consideration. *Dobbins v. City Bond & Mortgage Co.*, 343 Mo. 1001, 124 S.W.2d 1111, 1116 (1938); *Lingenfelder v. Wainwright Brewery Co.*, 103 Mo. 578, 15 S.W. 844, 848 (Mo.1891); and *Rexite Casting Co. v. Midwest Mower Corp.*, 267 S.W.2d 327, 331 (Mo.App.1954).

It appears patently obvious that this court for the most part must resort to general principles of contract law in order to resolve the issue as to the presence or lack of a "new" and "independent" consideration to support the guaranty. Any meaningful discussion of this issue in the context just mentioned requires legal identification of the parties in terms of their relationship under the written guaranty. With this thought in mind Forum may be said to be both a guarantor and a promisor, North Hills Bank may be said to be both a guarantee and a promisee, C & M may be said to be both a guarantee and a promisee, and Berbiglia, whose performance under the lease was guaranteed by Forum, may be said to be the principal obligor. At the risk of being repetitious, it should be borne in mind throughout the following discussion that the construction loan made by North Hills Bank to C & M, and all its attendant conditions, occurred after the lease was executed and were in no way involved in the negotiation or execution of the lease.

Consideration to support a guaranty need not run to the guarantor-promisor. *Industrial Bank & Trust Co. v. Hesselberg*, 195 S.W.2d 470, 474 (Mo.1946). There it was held that a loan by a promisee under a guaranty to the principal obligor whose obligation was the subject of the guaranty was adequate consideration to support the guaranty. Rationale for the holding finds expression in the following language (this court has taken the liberty of interpolating in brackets, at appropriate places, the names of corresponding parties in the case at bar): "It is not necessary to the validity of contract that a consideration be of real value to the promisor [Forum]. A benefit

to a third person, or a detriment to the promisee [North Hills Bank] or a change in his relations in consequence of the promise is sufficient consideration to render the promisor [forum] obligated." *Id.* Accord: *Miner v. Bennett,* 556 S.W.2d 692, 696 (Mo. App.1977). A syllogistic application of the principle relied upon in *Industrial Bank & Trust Co. v. Hesselberg, supra,* to the facts at hand supports the conclusion that the loan by North Hills Bank to C & M, viewed in its most restrictive sense, constituted a "new" and "independent" consideration to support the guaranty as between North Hills Bank and Forum.

Resolution of the more crucial companion issue—was it essential or necessary that consideration to support the guaranty in favor of C & M move directly from C & M to Forum—calls upon this court to resort to general principles of contract law by reason of a dearth of specific case authority. The general principle deemed most pertinent and applicable is broadly put as follows (with this court once again engaging in interpolation) in *John Davis & Co. v. Cedar Glen # Four, Inc.,* 75 Wash.2d 214, 450 P.2d 166, 171 (1969): "It is not essential that the consideration move directly from the promisee [C & M]. It is sufficient if it moves from a third person [North Hills Bank]. Generally, if consideration is sufficient in other respects, it does not matter from whom the consideration moves. It may move from a third person [North Hills Bank] as well as from the promisee [C & M]." This general principle is stated with even greater acuity in the Restatement of Contracts § 75(2) (1932): "Consideration may be given to the promisor or to some other person. It may be given by the promisee [C & M] or by some other person [North Hills Bank]." A syllogistic application of the general principle of contract law just mentioned supports the further conclusion that even when the guaranty is viewed in the equally restricted dimension of a guaranty running in favor of C & M, the loan by North Hills Bank to C & M constituted a "new" and "independent" consideration for its support.

If the single consideration, i. e. the loan by North Hills Bank to C & M, was adequate to separately support Forum's guarantee of Berbiglia's performance under the lease to either North Hills Bank or to C & M, then the only remaining question is whether the single consideration was adequate to support both guaranties when viewed conjunctively. Once again, resort to accepted principles of general contract law supports the conclusion that a single consideration may support a number of promises. Reference is made to the following excerpt from 1 Corbin on Contracts § 125, at 535–36 (1963): "A single and undivided consideration may be bargained for and given as the agreed equivalent of one promise or of two promises or of many promises. The fact that there are many promises given in exchange for the one consideration does not make it insufficient as to any of them. *If it would be sufficient to support each of the promises taken separately, it is sufficient for all of them.*" (Emphasis added.) *Accord*: Williston on Contracts § 137A, at 594 (3d ed. 1957); and Restatement of Contracts § 83 (1932). A syllogistic application of the principle of general contract law gleaned from the highly respected texts just cited, in conjunction with all previous conclusions drawn, supports the final, capping conclusion that the single consideration, i. e. the loan by North Hills Bank to C & M, constituted a "new" and "independent" consideration to support Forum's promise to guarantee Berbiglia's performance under the lease to both North Hills Bank and C & M.

Having probed the various facets of the consideration issue raised by Forum in terms of applicable principles of general contract law, this court is constrained to hold that adequate consideration existed to support the guaranty in favor of C & M, as well as in favor of North Hills Bank, notwithstanding Forum's argument that adequate consideration, at best, existed only in support of the guaranty in favor of North Hills Bank.

Having found no prejudicial error committed by the triers of fact, Berbiglia's efforts to absolve itself of legal responsibility

for or to mitigate the consequences of unilaterally abandoning its solemn obligation under the lease and Forum's effort to escape responsibility to C & M under its guaranty must both fail.

Judgment affirmed.

All concur.