Henry W. ROSS, and Henry Ross Construction Co., Inc., Plaintiffs-Appellants-Respondents,

v.

James O. HOLTON, Jr., and Emanuel N. Maisel, R.A. Lander, M.A. Dorfman, Irving Moroff, Donald Sharfman and Marvin Sheplow, Defendants-Respondents-Appellants.

Nos. 43412, 43413 and 43426.

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 24, 1982.

Motion for Rehearing and/or Transfer Denied Oct. 15, 1982.

Applications to Transfer Denied Nov. 15, 1982.

Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for defendants-respondents-appellants.

Robert C. Jones, Clayton, William C. Portell, St. Louis, for plaintiffs-appellants-respondents.

PUDLOWSKI, Judge.

This is an appeal from a judgment rendered in the circuit court, County of St.

Louis. The respondents, Henry Ross and Henry Ross Construction Co., Inc., (hereinafter referred to as Ross), brought suit against appellant, James Holton (d/b/a Holton Development Co.) (Hereinafter known as Holton), for breach of contract. In addition, Ross brought suit against appellant, E.N. Maisel and Associates (a partnership engaged in the development and management of real estate for commercial purposes) for tortious interference with the contractual relationship allegedly breached by Holton. The jury returned a verdict against Holton in the amount of $13,000.00. The jury also returned a verdict against E.N. Maisel and Associates (hereinafter referred to as Maisel) in the amount of $10,890.00 actual damages, and $18,250.00 punitive damages. The trial judge entered judgment upon these verdicts on July 23, 1980. By order of September 3, 1980, the trial judge directed a verdict against Ross and in favor of Maisel on the punitive damages award on the grounds that it was against the weight of the evidence. All parties appealed.

The evidence shows that in 1973 Holton was interested in the development of a tract of land in the City of Maplewood adjacent to the Citizens National Bank. At that time Holton was the president and chief stockholder of the bank. He was not an officer of Holton Development Co. Holton owned the bank building and several parcels of land within the proposed development tract. In addition, Holton Development Co. owned several of the parcels in the tract. In the fall of 1973, Hugh Erkmann, vice-president of Mark Development Co., (a/k/a Holton Development Co.) contacted Ross about the proposed development. Erkmann and Ross held a meeting in the Citizens National Bank Building during which Ross received his first introduction to the proposed development. The development entailed the construction of a retail shopping complex on the proposed site with one major retail tenant.

Following this first meeting Holton and Erkmann visited a commercial site being constructed by Ross. Soon thereafter a second meeting was held at Citizens National Bank between Holton, Erkmann and Ross. At this meeting Holton made a detailed presentation on the development and gave Ross a fact sheet about the proposal printed on Holton Development Co. stationary. Holton assured Ross that he controlled or could gain control of all the parcels located in the proposed development site. Holton summoned the Mayor of Maplewood to the meeting. The Mayor assured Ross that the tract would be assembled through condemnation if a major retail tenant for the development could be found. Ross testified that at this meeting he entered into a verbal agreement with Holton whereby Ross was granted the power to develop or cause the development of a major retail department store on the proposed tract adjacent to the Citizens National Bank. A letter dated October 10, 1973, written on Holton Development Co. stationary and signed by Erkmann stated that Ross was granted the authority "to develop, or cause to develop" the proposed Maplewood site. A copy of the letter was retained in Holton's files.

Within a day or two following the second meeting at the Citizens National Bank, Ross contacted Maisel about the proposed development. Marshall Goldman, a partner in said partnership, expressed interest in the project. Ross arranged a meeting held on or about October 17, 1973 at Citizens National Bank Building, attended by Holton, Ross, Erkmann and Goldman. Holton made another presentation to Goldman about the project. Following the meeting Ross informed Goldman that he was authorized to develop the tract and showed Goldman the October 10 letter to that effect. Ross also expressed his interest in entering a joint venture. He proposed that he would retain a fifty percent interest in the project as a developer with the remaining fifty percent interest held by Maisel. Goldman agreed to this proposal.

During the following months, pursuant to the discussions between the parties, Maisel approached a large discount department store chain to determine whether it would be interested in becoming the major tenant of the proposed development. Ross sent

two letters to Maisel during this period relaying information about the project to Maisel and seeking information on the progress of discussions with the store chain. Unbeknownst to Ross, Goldman and Holton continued to deal with one another. During the first part of 1974 Goldman and Holton had numerous discussions about Holton's control or ability to gain control of all the land for the project. These discussions laid the foundation for the sale of the property in question to the developer. In these discussions Holton represented himself to Goldman as the owner of Holton Development Co.

On August 28, 1974, Erkmann notified Ross that Maisel had failed to invite Ross to a meeting scheduled for the following day. Holton told Erkmann to invite Ross to get things resolved "with no hanky panky."

On August 29, Ross went to the Citizens National Bank Building for the meeting. Soon after his arrival E.N. Maisel arrived. Maisel owns seventy percent of the appellant partnership. Upon his arrival, Maisel was disappointed to find Ross present. Before the full meeting began Holton, Ross and Maisel met in Holton's office. At this preliminary meeting Holton informed Maisel that he would have to deal with Ross in the development of the project, since Ross was originally authorized to develop the project. Maisel refused to deal with Ross in any manner. After this preliminary meeting ended, the scheduled meeting began with, among others, Holton, Ross, Maisel, Goldman and Erkmann present. At the inception of this meeting, Holton reiterated the fact that Ross was authorized to develop the project in question.

On August 29, 1974, Holton executed two agreements with Maisel. In the first agreement Holton promised to deliver the land necessary for the project to Maisel. This agreement was accepted by Maisel on August 30, 1974. In the second agreement, Holton agreed to share equally certain site development costs with Maisel. Holton testified that he was under pressure from Maisel to sign the agreements, because it would not be possible to move ahead on the project without some written assurance that the land would be available for purchase by Maisel. At the time these agreements were signed, Holton and Maisel were aware that the dispute as to Ross's right to participate as a developer under the agreement between Holton and Ross, was unresolved.

On September 11, 1974, an attorney for Holton, who was also present at the August 29 meeting, wrote a letter to Ross. In this letter the attorney stated that from the conversations at the August 29 meeting he surmised that Maisel and/or Ross would be the developer. The attorney did not inform Ross of the two agreements signed by Holton and Maisel on August 29. On October 2, 1974 Ross responded to the attorney's letter, and advised him that no agreement with Maisel should be signed by Holton until Ross and Maisel worked out the details of Ross's participation. Ross subsequently received a letter from Maisel denying Ross's claim that he had a right to participate in the project as a developer. Maisel proceeded to develop the Maplewood site without any participation by Ross. This litigation followed.

I

We begin by considering the assertions of Holton and Maisel, that the trial court erred in failing to direct a verdict against Ross on both the contract claim and the tort claim. In considering Ross and Maisel's contentions, our standard of review is quite clear. We must view the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party, Ross. *Wessler v. Wessler*, 610 S.W.2d 650, 651 (Mo. App.1980). Applying this standard we find that Ross evinced sufficient evidence to establish a submissible case for the jury on both the contract and tort claims.

■ Initially we note that one element of a cause of action for intentional interference with contractual relations is the existence of a contract or valid business relationship between the plaintiff and a third party. *Smith v. Standard Oil*, 567 S.W.2d 412, 417 (Mo.App.1978). Existence of a contract

is also an essential element of any claim for breach of that contract. *Veterans Linoleum & Rug, Inc. v. Tureen,* 432 S.W.2d 372, 378 (Mo.App.1968). Maisel and Holton claim that Ross failed to produce sufficient evidence to submit to the jury the question of whether there was a contract for development of the tract between Holton and Ross.

 This allegation is based upon the lack of any written evidence of an agreement. Holton and Maisel argue that the letter to Ross dated October 10, 1973 signed by Erkmann does not establish the existence of an agreement between Ross and Holton. Ross does not allege, however, that this letter, standing alone, constitutes a written agreement between Ross and Holton. Ross argues that he and Holton entered an oral agreement, and the October 10 letter serves as additional evidence which supports that agreement. Ross testified that Holton offered him the opportunity to develop the project, and that he accepted. There is evidence that Ross proceeded to develop the project by contacting Maisel. Holton's statements and actions at the meeting on August 29, 1974 indicate his belief that Ross did have an interest as a developer in the project. This was clearly reflected in the letter written by Holton's attorney on September 11, 1974. There is sufficient evidence to support a finding of an oral agreement between Ross and Holton in which Holton gave Ross the power to develop the project. The testimony of the witnesses on this issue is in conflict. Its resolution, however, turns on the credibility of the witnesses, and weighing the credibility of witnesses is for the jury. *Carvitto v. Ryle,* 495 S.W.2d 109, 112 (Mo.App.1973).

Holton and Maisel argue that the letter of October 10, 1973 does not specify the consideration which Ross was to receive for his services, and it fails to specify the extent to which Ross was to participate as a developer. As noted above, Ross does not allege that the letter of October 10 was the contract breached by Holton. Thus, the absence of those terms from the letter is irrelevant. With respect to the oral agree-

ment, we recognize that the determination of the terms in such an agreement is within the province of the jury. *Stagner v. Staples,* 427 S.W.2d 763, 766 (Mo.App.1968). Valuable consideration may consist of some right, interest, profit or benefit. *Carvitto v. Ryle, supra* at 113. There was ample evidence that the position of developer in a commercial retail development is a highly lucrative position which entails substantial profit. Thus, the jury could properly find that Ross's promise to develop the project was supported by consideration. Furthermore, there was ample testimony that Holton granted Ross the power to develop the project on his own or in conjunction with another. The jury could reasonably find that the decision to develop the project with another and the extent of participation by each developer in the joint venture were left to Ross's discretion in the exercise of his general power to develop the project. Under these circumstances, the percentage of Ross's interest as a developer in a joint venture to develop the project is not an essential term of the contract between Holton and Ross.

 Another essential element of Ross's claim for intentional interference with contract was by Maisel legal malice. *Downey v. United Weatherproofing,* 363 Mo. 852, 253 S.W.2d 976, 980 (1953). "Legal malice" is the intentional doing of a wrongful act without justification. *Id.* In this context, Maisel must have had knowledge of the contractual relationship; must have had intentionally interfered by inducing or causing a breach of the contractual relationship; and, must have acted without justification. *Id.; Smith v. Standard Oil, supra.* Maisel claims that there was no evidence that he knew of the contract. In addition, Maisel claims that the evidence proves that he acted with justification.

The evidence reveals that Maisel became aware of the contract between Ross and Holton in October, 1973, when Marshall Goldman first discussed the project with Ross and Holton. There is conflicting testimony on this point, but the resolution of that conflict is left to the jury in its deter-

mination of the witnesses' credibility. *Carvitto v. Ryle, supra.* In addition, there is ample evidence that Maisel was aware of the arrangement between Ross and Holton on August 29, 1974. We find sufficient evidence to support a jury finding that the partnership knew of the Ross-Holton contract prior to, and at the time the breach occurred.

■ Maisel claims that he was justified in his actions because Ross invited Maisel into the project. Maisel cites *C & M Developers, Inc. v. Berbiglia,* 585 S.W.2d 176 (Mo. App.1979), in support of its position. *Berbiglia,* however, is not applicable in the case at bar. In *Berbiglia,* all the evidence indicated that the person alleging interference (lessee) invited the alleged interferor (lessor) to negotiate directly with the third party (prospective tenant) in hopes that the negotiations would result in a new lease agreement relieving the lessee of his rent obligations. *Id.* at 185. In the case at bar, Ross was not under any obligation to Maisel. He did not invite Maisel into the project for the purpose of relieving him from any liability. There is ample evidence that Maisel was invited in by Ross, not to assume Ross's position as developer, but to share that position. In these circumstances the jury could properly find that Maisel was not justified in appropriating the position of developer for himself.

■ We turn now to consider the instructional error alleged by Holton. Holton asserts that the trial court erred in giving Instruction No. 5, the contract verdict director. The basis for his contention is that the instruction given was patterned after MAI 26.01, and case law clearly requires that under the facts of this case the verdict director be patterned after MAI 26.06. The record reveals that Instruction No. 5 was labeled as "MAI 26.01, submitted by plaintiff." An examination of the instruction itself, however, reveals that it is patterned after MAI 26.06. We find no error in the substance or form of the verdict director on the contract claim, and we certainly cannot predicate error on the grounds that it is mislabeled.

## II

■ The next issue is the actual damages awarded against Holton and Maisel. They allege that Ross was awarded actual damages twice for the same injury. One award was under the contract claim, and the other was under the tort claim. After a careful review of the verdicts and damage instructions, we find that the trial judge committed prejudicial error when it gave the same damage instruction, MAI 4.01, following the verdict directors on both the contract claim and tort claim. Ross asks us to assume that the jury did the right thing. We cannot make such an assumption, however, when the jury was misinstructed and followed the faulty instructions.

Before discussing the basis for our holding, we note that the primary difficulty is to ascertain the proper damage instructions where plaintiff sues both the contract breacher and the party who tortiously interfered with the contract in a single proceeding. Our research and that of the parties reveal that this is a matter of first impression in the State of Missouri. We must review the substantive law in order to suggest what instructions could be given.

■ It is apparent that in a situation presented by the case at bar, Ross had two separate and distinct causes of action. One is against Holton for failing to perform his obligation to Ross under the contract. The other is against Maisel for breaching his duty not to interfere with Ross's contract property rights. *Downey v. United Weatherproofing, supra* at 980. The two causes of action are against two defendants for two different wrongful acts and are based upon two different rules of law. As a result, Ross may properly pursue both causes of action and the pursuit of one cause of action does not impair his right to pursue the other. *See* Restatement (Second) Torts, § 766, Comment V; W. Prosser, *Law of Torts* (4th ed.) § 129, p. 948; *Childress v. Abeles,* 240 N.C. 667, 84 S.E.2d 176 (1954); *Davison Fuel & Dock Co. v. Pickands Mather & Co.,* 54 Ohio App.2d 177, 376 N.E.2d 965 (1977).

While the causes of action in this case involve separate and distinct wrongful acts committed by different parties, there are important commonalities which affect the damages question. The nexus between the two causes of action is the breach of the contract, for as indicated earlier, breach of the contract is an element of both causes of action. This is the element from which the injured party's actual damages flow on both the contract and tort claims. This does not mean, however, that the measure of actual damages on both causes of action are coextensive.

Under the contract claim the injured party can recover actual damages for the direct and natural consequences of the breach, or for damages that were within the contemplation of the contracting parties. *Forsythe v. Starnes,* 554 S.W.2d 100, 109 (Mo.App.1977); *Nemela v. Coca-Cola Bottling Co.,* 104 S.W.2d 773, 776 (Mo.App. 1937). The damages recoverable for intentional interference are not measured by contract rules. The injured party can recover from the tortfeasor: the pecuniary loss of the benefits of the contract; consequential losses for which the interference is the legal cause; and, emotional distress or actual harm to reputation if they are reasonably to be expected to result from the interference. Restatement (Second) Torts § 774 A; 45 Am.Jur.2d, Interference § 57. Thus, the actual damages under the contract claim and tort claim will be coextensive only with respect to the lost benefits of the contract which were a direct and natural consequence of the breach, or within the contemplation of the contracting parties. In this case the evidence on damages submitted by Ross went to the direct and natural consequences of the contract breach only. Such evidence was the same for both causes of action. In addition, the jury received the identical damage instruction for both causes of action. It is manifestly clear that the jury awarded damages to the plaintiff twice for the same injury, i.e., lost benefits of the contract which were a direct and natural consequence of the breach.

It is well settled in Missouri that a party cannot be compensated for the same injury twice. *Stewart v. Sioux City & New Orleans Barge Lines, Inc.,* 431 S.W.2d 205, 209 (Mo.1968); *Kelsey v. Kelsey,* 329 S.W.2d 272, 275 (Mo.App.1959). Ross cannot collect double recovery (once from each defendant) for actual damages which are coextensive under the contract and tort claims. The proper means of avoiding this result can be determined by analogy to a similar situation. In *Barlow v. Thornhill,* 537 S.W.2d 412 (Mo. banc 1976), the Supreme Court was confronted with a situation where two persons acting independently were guilty of separate and distinct acts of negligence which caused an indivisible injury. *Id.* at 418. In that situation the court held that the parties were jointly and severally liable for the plaintiff's injury. *Id.* In the case at bar Holton and Maisel acted independently in committing separate and distinct wrongful acts which caused an indivisible injury. We conclude that they are jointly and severally liable for Ross's singular injury which was coextensive. Joint and several liability on the injury caused by the party who breached the contract and by the tortfeasor who tortiously interfered with the contract has been adopted as the proper rule in other jurisdictions. *See e.g. Bermil Corp. v. Sawyer,* 353 So.2d 579, 585 (Fla.App.1977); *Armendariz v. Mora,* 553 S.W.2d 400, 406 (Tex.Civ.App. 1977).

With the apercu of the substantive law and pertinent facts we suggest that the trial court submit one damage instruction MAI 4.01. Certainly, if Ross had sustained and proven damages other than those arising out of the singular act (breach of contract) additional instructions would have been necessary, but he did not.

### III

We now come to the punitive damages question. Ross asserts that the trial court erred when it directed a verdict against him on punitive damages after the jury had found punitive damages in the amount of $18,250.00. We agree.

The trial judge directed a verdict against Ross on the grounds that there was insufficient evidence to support punitive damages. In the area of intentional torts a submissible punitive damages question is made for the jury once the plaintiff has presented sufficient evidence of legal malice—the intentional doing of a wrongful act without just cause or excuse. *Pollack v. Brown,* 569 S.W.2d 724, 733 (Mo. banc 1978). This is an element of intentional interference with contract, and as we noted earlier, Ross presented sufficient evidence from which a jury could reasonably find that Maisel acted with legal malice. Since Ross presented sufficient evidence to submit the punitive damages question to the jury, the trial court erred when it directed a verdict against him.

Once a submissible tortious interference case is made the amount of punitive damages to be awarded is wholly within the discretion of the jury, and a court cannot interfere with the jury's assessment of punitive damages unless there is an abuse of discretion, or the size of the award is indicative of passion, prejudice or bias. *Beggs v. Universal C.I.T. Credit Corp.,* 409 S.W.2d 719, 724 (Mo.1966). There is nothing in the record to indicate that the jury abused its discretion, or acted with passion, prejudice or bias.

Punitive damages are imposed for punishment and deterrence. *Wuerderman v. J.O. Lively Const. Co.,* 602 S.W.2d 215, 222 (Mo.App.1980). It follows that there is no fixed relationship between the amount of actual damages and the amount of punitive damages. *Hoene v. Associated Dry Goods Corp.,* 487 S.W.2d 479, 486 (Mo. 1972). The punitive damage award must merely bear some relation to the injury inflicted and the cause thereof. *Beggs v. Universal C.I.T. Credit Corp., supra.* A showing of legal malice combined with a recovery of only nominal damages will support a punitive damages award. *Holcroft v. Missouri-Kansas-Texas R. Co.,* 607 S.W.2d 158, 163 (Mo.App.1980). The jury found legal malice and actual damages. That finding is therefore undisturbed by this opinion.

Upon retrial after the jury determines actual damages against Maisel, the trial court is ordered to reinstate the judgment in favor of Ross and against Maisel in the amount of $18,250.00 for punitive damages.

Reversed and remanded for trial on actual damages against both defendants in accordance with this opinion.

SMITH, P.J., and SATZ, J., concur.