GENE H. WANDELL ET AL., PLAINTIFFS, v. MAMIE ROSS ET AL., MAMIE ROSS, JOSEPH G. ROSS, DEFENDANTS. GENE H. WANDELL ET AL., PLAINTIFFS & RESPONDENTS, v. MAMIE ROSS ET AL., DEFENDANTS, MAMIE ROSS ET AL., APPELLANTS.—245 S. W. (2d) 689.

Kansas City Court of Appeals. Opinion delivered January 7, 1952.

1190

*Clif. Langsdale,* and *Gibson Langsdale,* for appellants.

1194

*Richard C. Jensen,* for appellant-respondent, *Joseph G. Ross.*

*Clarence H. Dicus, Glenn E. McCann, and Bundschu, Bailey & Hodges* of Counsel.

BROADDUS. P. J.—This is a suit by plaintiffs Gene H. Wandell and Rebecca Wandell, against defendants Mamie, Frank J. and Joseph G. Ross, claiming damages for loss of future profits caused by an alleged breach of a written contract which defendants assert is a real estate lease, plaintiffs a license. Plaintiffs recovered judgment in the amount of $4000 against all three defendants. Defendant Joseph G. Ross filed a cross-claim against defendants Mamie and Frank J. Ross and recovered judgment against them for any sum he should be forced to pay as a result of plaintiffs' said judgment. The three defendants appeal from the judgment in plaintiffs' favor (our cases Nos. 21627-28) and defendants Mamie and Frank J. Ross also prosecute an appeal from the judgment in favor of defendant Joseph G. Ross, on his cross-claim (our case No. 21626.)

Plaintiffs, husband and wife, are partners doing business as "G. and R. Concessions." Since 1945 the partnership has engaged in the business of furnishing hat checking services, selling tobaccos and sundry products in the Hotel President, Hotel Continental and other hotels and eating establishments in Kansas City, Missouri.

Defendants, Mamie, Frank J. and Joseph G. Ross, throughout 1947 were partners doing business as "Ross' Il Pagliaccio Restaurant" in Kansas City, Missouri. The building in which the restaurant was located was owned by Mamie and Joseph G. Ross, parents of Frank J. Ross.

The instrument which forms the basis of this suit is styled "Store Lease". The first three paragraphs are as follows:

"THIS LEASE, made this 15th day of May, 1947, by and between ROSS IL PAGLIACCIO, party of the first part, hereinafter called the Lessor, and G. & R. CONCESSIONS, party of the second part, hereinafter called the Lessee.

"WITNESSETH: That said Lessor hereby leases to said Lessee the hat checking space to the front and left of front entrance doors, the premises located at 600 East 6th Street, Kansas City, Missouri, to be used for the purpose of hat checking service, cigars, cigarettes, novelties, jewelry, confections, and/or kindred merchandise, for a term of three (3) years, beginning April 19th, 1947 and ending April 19th, 1950, and the said Lessee agrees to pay for use and rent thereof a total of Nine Hundred Dollars ($900.00) per year at the

rate of $100.00 per month for October, November, December, January, February and March, and $50.00 per month for April, May, June, July, August and September, on the first of each month.

"The Lessee covenants and agrees with the Lessor as follows:

"1. Lessee agrees to furnish adequate hat checking service for luncheons and dinners, and further agrees to discharge any employee that does not abide by the rules of the Il Pagliaccio establishment at the request of the management. It is further agreed that the Lessor hereby gives the Lessee an option to renew this lease for two (2) years after the end of the term hereof upon the giving of notice in writing to the Lessor on or before April 19th, 1950 at the rate of $1,200.00 per year payable $100.00 per month on the first day of each month."

It contains other provisions usually found in leases. It was executed: "Il Pagliaccio Restaurant, by Jos. R. Ross, Manager" and "G. & R. Concessions, by Gene Wandell, Manager."

Plaintiffs operated the hat checking concession in the restaurant from April 19, 1947 until November 30, 1947, at which time they were ordered from the premises by defendant Frank J. Ross.

The claim of defendant Joseph Ross to relief on his cross-claim against defendants Mamie and Frank Ross grows out of a property settlement agreement which was executed by all of them on February 18, 1948, incident to a divorce action instituted by Mamie against Joseph Ross in July, 1947. By paragraph 8 of that agreement Joseph G. Ross conveyed to Mamie and Frank Ross all of his interest in the restaurant, and Mamie and Frank Ross agreed to indemnify him from "any debt or obligation of any kind of said business, except any undisclosed obligations which may have been incurred or created by Joseph G. Ross."

This is a brief outline of the case. Additional facts will be set out as we consider defendants' assignments of error.

Defendants' first contention is that the court erred in not sustaining their motions for directed verdicts because: "There was a surrender by operation of law which terminated any rights and interests of the plaintiffs under any tenancy whether by lease or otherwise."

A surrender by operation of law results from acts which imply mutual consent independent of the expressed intention of the parties that their acts shall have that effect. (32 Am. Jur. 766.)

The evidence shows that plaintiffs quit the premises when they did because they were ordered by defendant Frank Ross to vacate by December, 1947. Plaintiff Gene Wandell asked Frank Ross why he wanted to terminate the relationship and offered to make adjustments; but Frank Ross gave no reason—merely remained "firm in his stand that he wanted us out." On November 28, 1947, Mr. Wandell wrote a letter to Frank Ross stating: "We cannot understand your attitude * * *. If there are any phases of our service that you or your

guests do not like we will be only too glad for you to tell us so we can make necessary adjustments that will meet with your approval.'' Accompanying this letter was plaintiffs' check for $100 payable to Frank Ross to cover rent for December, 1947. Frank Ross refused to accept this check and returned it to plaintiffs.

When all of Mr. Wandell's efforts failed Mrs. Wandell approached Frank Ross and said to him: ''I would like to discuss it with you and make some adjustment. He said: 'I want you out', in a loud voice; it created quite a commotion, and the customers all turned around and looked toward me from the bar, so I dropped it. And I went down after that, a few days after that, during the day, and went to his office and talked with him and begged him to tell me why he wanted us to vacate, and if there was any reason why that we could control, any adjustment we could make, we'd be most happy to make any adjustment that he wanted us to make in order to keep the concession; I was willing to go along with him on any suggestion and he refused to make any—all he would tell me was that he just wanted us out.''

From this it is obvious that plaintiffs desired to continue the relationship and it was only after all their efforts to retain it failed that they vacated the premises. Certainly defendants cannot rightfully maintain that plaintiffs created a surrender by operation of law merely because they did not wait to be bodily hurled from the restaurant.

All of the cases cited by defendants on this point are based upon the fundamental principle that a surrender takes place only when there is mutual consent and agreement, either actual or implied, to the termination. The facts in those cases called for the application of that rule. Those in the case at bar do not.

The next point advanced is that the contract was a lease conveying an interest in real property. Upon that basis defendants Mamie and Frank Ross assert that it is void as to them because they are not named in it nor did they personally execute it, nor was defendant Joseph Ross authorized in writing to execute it as their agent. Their contention is based upon the requirements of our statute (sect. 432.050 R.S.Mo. 1949) that leases of real estate must be in writing, signed by the parties or their agents lawfully authorized by writing, otherwise they shall have the force and effect of estates at will only.

It is true that the instrument recites that it is a ''store lease'' and contains technical words of demise. ''But the mere fact that it is denominated a lease and employs technical words of demise is not sufficient in law to constitute the instrument an indenture of lease if it, in fact, appears to be something other than that.'' (Whiteside v. Oasis Club, 162 Mo. App. 502, l.c. 506.)

This contract, although called a lease, is in the nature of a license. It merely gave plaintiffs the right to conduct a concession in defendants' place of business. A license in respect of real property has been

defined as "a privilege to go on the premises for a certain purpose, as, for example, the purpose specified in the instrument creating the license; it does not operate to confer on, or vest in, the licensee any title, interest, or estate in such property." (53 C.J.S. Licenses #84.)

The difference between a license and lease is set out in 32 Am. Jur. 30-31 where the following appears:

"It is recognized that it is often difficult to distinguish between a license and a lease. * * * the distinguishing characteristic of a lease is that it carries a present interest and estate in the land for the period specified, and the criterion seems to be the right to the possession of the land, and if such right is not conferred, the transaction is to be deemed a license, profit, or easement. *A license to do an act upon land involves the exclusive occupation of the land by the licensee, so far as is necessary to do the act, and no further, whereas a lease gives the right of possession of the land, and the exclusive occupation of it for all purposes not prohibited by its terms.*" (Italics ours.)

The same principle is set out in 51 C.J.S. 513 as follows:

"In other words, *the principal test* for determining whether the relationship created is that of landlord and tenant rather than that of licensor and licensee *is whether the contract confers exclusive possession of the premises as against all the world, including the owner,* and a mere permission to use land, dominion over it remaining in the owner and no interest in, or exclusive possession of, it being given, is but a license." (Italics ours.)

There was no exclusive possession given plaintiffs, and the indefinite space involved was solely for the purpose of carrying on the concession. Plaintiffs had no access to the building except at such times as defendants should open it for the purpose of carrying on their restaurant business. The checking stand belonged to defendants. All that plaintiffs had on the premises was their "inventory"; this Frank Ross stated "didn't weigh over five pounds" when plaintiffs left and according to him "included ten cartons of cigarettes, four boxes of cigars, three boxes of chewing gum, and three boxes of mints; that was his entire inventory, and that was his biggest inventory at any time."

The contract recites that the space is let to be used for the purpose of "hat checking *service*"; that plaintiffs agree to "furnish adequate hat checking *service* for luncheons and dinners, and to discharge any employee that does not abide by the rules" of defendants' establishment. Thus *service* to defendants and their patrons was the real purpose of the agreement—not to pass an estate in land. That is the way defendant Frank Ross construed it. After testifying that he complained to Mr. Wandell about the type of girls put in charge of the concession he said: "The only time I got good, competent help was when his wife would come down and work the check stand;" that about November 1st, he said to Mr. Wandell: "If there's no improvement in the *service* around here, I want you out of there in thirty

days'' and ''had I received improvement, he could have talked me into staying, but he had to improve his *service.*''

In our opinion, the contract was not a lease conveying an interest in real estate.

From the facts, it is apparent that the granting of this concession by Joseph Ross, as manager, in behalf of the partnership was within the scope of the partnership business.

The evidence shows that Mr. Wandell first handed the contract to Frank Ross, who ''read it and said it was agreeable with him.'' Frank Ross then stated that his father (Joseph Ross) signed all the papers and referred Mr. Wandell to him. Joseph Ross read the contract and executed it. At the same time Mr. Wandell made the first payment to Joseph Ross, who in turn returned to the table in the restaurant to sit with Frank and Mamie Ross and there handed the check to Mamie Ross and placed the executed agreement on the table. Frank Ross admitted that he said to Mr. Wandell: ''My dad (Joseph Ross) will take care of the checking concession; he'll handle the rental on it; give him the check.'' Subsequently, Mamie and Frank Ross received and cashed the monthly checks called for by the contract. Thus it is apparent that all three of the defendants knew of the execution of the contract; that Joseph Ross executed it at the request of Frank Ross, and that Frank and Mamie Ross cashed the checks which were paid in accordance with the terms of the contract. The entire transaction dealt with an essential service to defendants and the patrons of their restaurant.

Defendants next contend that plaintiffs' evidence relative to loss of future profits is ''too remote, uncertain, vague and speculative to warrant submission to the jury or allowance.''

Plaintiff Gene Wandell testified that the net profit which plaintiffs derived from both the checking service and sales of cigarettes, gum and mints amounted to $366.80 for the seven and one-half months they operated the concession. This was a monthly average of $48.91. On that basis had plaintiffs been permitted to operate the concession for the full three year term and the full two year option period their net profit would have been $2934.60. From this latter amount it is conceded there should be deducted $600 for increased rent during the two year option period and $366.80 which had been received by plaintiffs, leaving the sum of $1967.80.

Mr. Wandell also stated that receipts from the hat checking service were greater in the winter months than in the summer months; that during the month of November, 1947, plaintiffs' net profit from the checking service was $154.04. Using that month as an average winter month he undertook to compute the amount plaintiffs would have earned over the five year period. In this calculation he treated October as one of the winter months. However, plaintiffs' net profit from that service for the October (1947) that they conducted it was only $53.65.

What their profits would have been, say for the month of February—more or less than those for October—the jury had no way of knowing.

The rule which governs here is laid down by our Supreme Court in the case of Spruce Co. v. Mays, 62 S.W.(2nd) 824, l.c. 828, as follows:

"The law is now well settled that damages may be recovered for loss of profits by a breach of contract if the evidence is sufficiently certain and definite to warrant the jury in estimating their extent. Minneapolis Threshing Machine Co. v. Bradford, 206 Mo. App. 609, 227 S.W. 628. This rule has become part of the case law of England and the United States since the decision, in 1854, of the English case of Hadley v. Baxendale, 9 Exch. 341. *But this court and our courts of appeals have been strict in their evaluation of the sufficiency of the evidence* warranting a recovery of damages for loss of profits. Beginning with the early case of Taylor v. Maguire, 12 Mo. 213, followed by the later case of Callaway Mining & Mfg. Co. v. Clark, 32 Mo. 305, loc. cit. 310. and by Steffen v. Mississippi River & Bonne Terre Railway Co., 156 Mo. 322, 56 S.W. 1125, down to the late case of United Iron Works v. Twin City Ice & Creamery Co., 317 Mo. 125, 295 S.W. 100, this court uniformly *has refused to permit a jury to speculate as to what might be probable or expected profits as an element of damages.* Reference is made to the United Iron Works case, supra, 317 Mo. loc. cit. 135, et seq. 295 S.W. 109, for a review of the cases on this point. Under the facts and rulings of those cases, *anticipated profits are recoverable only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits.*" (Italics ours.)

We are of the opinion, under the evidence, that to permit plaintiffs to recover for loss of future profits in excess of $1967.80 would amount to speculation—not "based on proof of actual facts which present data for a rational estimate of such profits."

As stated the amount of plaintiffs' verdict was $4000. Defendants say the verdict was so excessive as to indicate bias and prejudice on the part of the jury and that we should set it aside. While the verdict is too large, we do not believe that it is the result of either passion or prejudice. We are of the opinion that this is a case in which a remittitur may properly be required of plaintiffs.

Defendants have attacked all of the instructions given on behalf of plaintiffs. Their attacks follow the same theme, namely, that controverted facts were assumed; that the instructions were too general, and that defendants' defenses were not taken into account. It would unduly lengthen this opinion to take up separately all of these complaints. We have found no prejudicial error in these instructions.

For instance, defendants claim that the execution of the contract and the capacity in which Joseph Ross executed it were questions of fact which should have been submitted to the jury. Actually, not one of the partners ever denied the execution of the contract. Instruction

P-1 states that Joseph Ross executed the contract as a partner. Even the pleadings admit the existence of the partnership and that Joseph Ross was a partner, and Joseph Ross's entire conduct with respect to the contract shows conclusively that he executed the same as a partner. It is not reversible error to assume the existence of undisputed facts in instructions. (Hendon v. Kurn, 174 S.W. (2nd) 806 (Mo.Sup.)

Defendants also complain because certain of their defenses were not submitted to the jury. These defenses are that the contract comes within the bar of the statute of frauds, or is void because it failed to name defendants as parties, or that there was a surrender by operation of law. These were all questions of law for the court, and, from what we have heretofore said, were not valid defenses.

Defendants Frank and Mamie Ross also challenge Instruction "D-1-D" given on behalf of defendant Joseph Ross on his cross-claim. It required a finding of the execution on February 18, 1948, of the agreement between defendants calling for dissolution of their partnership and wherein Mamie and Frank Ross agreed to indemnify Joseph Ross on account of any debt arising out of said restaurant business "except any undisclosed obligation"; and that at the time of said dissolution Mamie and Frank Ross "had knowledge of the existence" of the contract of May 15, 1947. (The one with plaintiffs.)

At the request of defendants Mamie and Frank Ross the court gave Instruction "D-2B". It is merely the converse of Instruction "D-1D" given on Joseph Ross's behalf. The issue was fairly submitted, and the verdict in favor of Joseph Ross on his cross-claim against defendants Mamie and Frank Ross was correct.

As stated, we are of the opinion that the evidence did not authorize a verdict in plaintiffs' favor for future profits in excess of $1967.80. If plaintiffs will, within 10 days from the date of filing this opinion, enter a remittitur in the amount of $2032.20, the verdict in plaintiffs' favor will be affirmed in the amount of $1967.80 as of the date of the original judgment, and the judgment, as so modified, will stand affirmed; otherwise, the judgment will stand reversed and the cause remanded with directions to the trial court to hold in abeyance the verdict in favor of Joseph Ross on his cross-claim until the case is disposed of by a re-trial of the issue of the amount of plaintiffs' damages only, and then to enter judgment for the defendant Joseph Ross on his cross-claim and for the plaintiffs for the damages, if any, so found in their favor on such re-trial thereof.

All concur.