**ANGELA BRADLEY, Plaintiff**

**v.**

**INTERNATIONAL VOYAGER MEDIA, INC. d/b/a ABARTA, A.H. RIISE GIFT SHOP, INC., ISIDORE PAIEWONSKY ASSOCIATES, MIKE DEHAAS, AND FINE WOODWORKING, SHOP, INC., Defendants**

Civil Jury No. ST-03-CV-0000417

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

September 11, 2008

MAN FEUERSTEIN, ESQ., MIKE E. GUGLIELMI, ESQ., Feuerstein & Smith, LLP, Buffalo, New York, *Attorney for the Plantiff*.

STEFAN B. HARPEL, ESQ., Dudley, Topper & Feuerzeig, LLP, St. Thomas, USVI, *Attorney for Fine Woodworking Shop, Inc.*

WILLIAM J. GLORE, ESQ., Dudley, Clark & chan, St. Thomas, USVI, *Attorney for A.H. Riise Gift Shop, Inc. and Isidore Paiewonsky Associates*.

DOUGLAS E. CAPDEVUE, ESQ., Law Offices of Douglas L. Capdeville, Christiansted, St. Croix, USVI, *Attorney for Int'I Voyager Media, Inc.*

CARL A. BECKSTEDT III, ESQ., Bryant, Barnes, Moss, Beckstedt & Blair, LLP, Christiansted, USVI, *Attorney for Defendant Mike DeHaas*.

HOLLAR, *Judge*

## MEMORANDUM OPINION

(September 11, 2008)

Before the Court is Defendant International Voyager Media, Inc. d/b/a Abarta's [hereinafter "IVM"] Motion for Summary Judgment requesting the dismissal of the instant action filed by Plaintiff Angela Bradley [hereinafter "Plaintiff"] with prejudice. Also before the court is the

request by co-defendant A.H. Riise [hereinafter "Riise"] that, should the Court grant summary judgment to IVM, the order explicitly note that the ruling does not affect Riise's cross-claim against IVM for breach of contract.

Defendant IVM contends that Plaintiff cannot sue IVM under the theory of *Respondeat Superior* because the person who operated the booth that caused the injury that is the subject of this litigation Jeanne McPherson [hereinafter McPherson] was not an employee of IVM but rather an independent contractor. In response, Plaintiff filed an Opposition to Defendant IVM's Motion for Summary Judgment, requesting the denial of IVM's motion because the Plaintiff's claim is not based exclusively on the theory of *"respondeat superior"*. More specifically, Plaintiff maintains that IVM would still be liable for McPherson's actions even if she were an independent contractor because IVM retained a right of supervision over her. Plaintiff also contends that IVM should be found liable under a theory of premise liability because IVM held a possessory interest in the property where the accident occurred. For the reasons that follow, IVM's Motion for Summary Judgment will be DENIED. Further, Riise's request that the court explicitly note that IVM may still be liable to Riise on the cross claim is MOOT.

## I. FACTUAL BACKGROUND

On November 8, 2002, Plaintiff was struck on the head by the outer shutter of an information booth or kiosk [hereinafter "the Booth"] while walking along the waterfront in Charlotte Amalie, St. Thomas. The Booth is owned by Riise who contracted with IVM to provide employees to man the booth and distribute literature provided by both Riise and IVM. IVM in turn contracted with McPherson to staff Riise's booth. While working in the Booth McPherson's duties included distributing Riise's and IVM's publications, directing foot traffic to Riise's stores, providing information to tourists, and performing other services as required by IVM.[1] Plaintiff claims that McPherson, who was working in the Booth at the time, negligently dropped the booth shutter down while she was walking by. As a result, the Plaintiff sustained injuries to her skull.

On August 27, 2003, Plaintiff filed an action in negligence against both Riise and IVM claiming *inter alia* that both defendants were the

---

[1] Contract between IVM and McPherson [hereinafter "Contract"] ¶ 1.

co-owners of the Booth and were both negligent through their agents, servants, and/or employees.[2] During discovery, Plaintiff subsequently discovered the booth was erected on land owned by Isidore Paiewonsky and Associates, Inc. [hereinafter "Paiewonsky"]; that the kiosk was constructed by Fine Woodworking Shop, and designed by Mike DaHaas. In addition to their answer to Plaintiff's original complaint, Riise filed a cross complaint on October 24, 2003 against IVM alleging that IVM breached its contract with Riise by not tendering a defense or indemnifying co-defendant Riise. On April 26, 2005, as a result of subsequent discovery, Plaintiff filed a motion to amend her complaint to add the additional parties of Paiewonsky, Mike DeHaas, and Fine Woodworking Shop, Inc. After a hearing held on January 4, 2006, the court granted the Plaintiff's motion to amend its complaint to add parties.

Defendant Paiewonsky filed an answer to Plaintiff's second amended complaint along with a cross-complaint against IVM claiming IVM breached its contract with Riise by failing to indemnify and tender a defense for Paiewonsky. Riise again filed an answer to Plaintiff's second amended complaint together with a cross-complaint against IVM for breach of contract by failing to indemnify and tender a defense for Paiewonsky. On November 16, 2005, IVM filed this Motion for Summary Judgment. Riise filed a Response emphasizing that IVM's motion has no affect on the contractual issues between Riise and IVM. IVM filed a Reply to Riise's Response to IVM's Motion for Summary Judgment requesting that the Court find that IVM has no contractual liability to Riise arising out of the contract.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The purpose of the summary judgment procedure is to "pierce the pleadings and to assess the proof in order to see whether there [is] a genuine need for trial." *LaFrance Equipment International Corp. v. Reed*, 20 V. I. 111, 113-115 (Terr. Ct. 1983).

---

[2] Original Complaint ¶ 14.

The court recognizes that summary judgment is a drastic remedy, and therefore, must resolve all doubts as to the existence of genuine facts against the moving party, and view all inferences drawn from the facts in the light most favorable to the party opposing the motion. *Paez v. Pittsburgh-Des Moin Corp.*, 21 V.I. 237 (Terr. Ct. St. C. 1985). Thus, the threshold inquiry becomes whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). *Anderson* mandates that a motion for summary must be granted unless the party opposing the motion demonstrates "that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

### III. ANALYSIS

■ In its Motion for Summary Judgment IVM contends it cannot be held liable for any negligence of McPherson, because pursuant to the employment contract between IVM and McPherson, McPherson was an independent contractor. In her Opposition, Plaintiff barely addresses this issue, instead focusing on reasons why IVM is liable even if the Court finds that McPherson was an independent contractor. Co-defendant Riise interjected itself into this particular controversy by asking the court to declare the court's decision ineffectual against its cross-claim against IVM. Hence, four (4) issues are before the Court for resolution: (1) whether McPherson was an independent contractor or an employee of IVM;[3] (2) whether Defendant IVM's had a lease or a license; and (3) whether the motion for summary judgment has any bearing on the contractual dispute between IVM and Riise.

### A. McPherson was an employee of IVM and not an independent contractor

■ ■ Under Virgin Islands Law the rules of the common law, as expressed in the restatements of law approved by the American Law

---

[3] RESTATEMENT (SECOND) OF TORTS § 414 (1965), reads in pertinent part:
One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Institute, shall be the rules of decision in the Courts of the Virgin Islands in cases in which they apply, in the absence of local law to the contrary[4]. V.I. CODE ANN. tit. 1, § 4. Because there is no local law to the contrary, to determine if any of McPherson's acts may be properly imputed to IVM, the court must look to the RESTATEMENT (SECOND) OF TORTS (1965), and the RESTATEMENT (SECOND) OF AGENCY (1958). According to § 409 of the RESTATEMENT (SECOND) OF TORTS, a principal is generally not liable for any physical harm of a third party caused by an independent contractor.[5] The rationale behind the rule is that the employer has no control over how the work is done, and thus should not bear any risk of harm.[6] *Id.* The triers of fact determine if the facts and circumstances taken together as a whole establish whether the worker is an employee or an independent contractor. RESTATEMENT (SECOND) OF AGENCY § 220 cmt. c. (1958). If the inference is clear that the person is either an employee or an independent contractor, the determination can be made by the court, otherwise, the jury determines the question after instruction are given by the court as to the matters of fact to be considered. *Id.*

 Pursuant to the RESTATEMENT (SECOND) OF AGENCY § 220, there are a number of factors to take into consideration when distinguishing between an employee and an independent contractor. Those factors include: (1) the extent of control the "master" is entitled to exercise over work details; (2) whether the person employed is engaged in a distinct occupation or business; (3) whether the type of work is customarily done by servants or independent contractors; (4) the amount of skill required; (5) the length of time the person is employed; (6) the method of payment (whether by the time or by the job); (7) whether the work is a part of the regular business of the employer; (8) whether the

---

[4] The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary. 1 V.I.C. § 4.

[5] Except as stated in §§410-429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants. RESTATEMENT (SECOND) OF TORTS § 409 (1965),

[6] The explanation for it most commonly given is that, since the employer has no power of control over the manner in which the work is to be done by the contractor, it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it. *Id.* § 409 cmt. b.

parties believe they are creating the relationship of "master" and "servant"; and (9) whether the principal is or is not in business. *Id.* Other factors include: (1) whether there was an agreement for close supervision or *de facto* close supervision of the servant's work; (2) whether the work requires the services of one highly educated or skilled; (3) the supplying of tools by the employer; (4) payment by hour or month; (5) employment over a considerable period of time with regular hours; (6) full time employment by one employer; (7) employment in a specific area or over a fixed route; (8) the fact that the work is part of the regular business of the employer, the fact that the community regards those doing such work as servants; (9) the belief by the parties that there is a master servant relation; and (10) an agreement that the work cannot be delegated. *Id.* § 220 cmt. h.

 The Contract between McPherson and IVM explicitly stated that she was an independent contractor, and could in no way be considered an employee of IVM.[7] Although IVM contends that the written contract is the decisive factor in characterizing McPherson as an independent contractor, the Court must look at the totality of facts and circumstances and not solely rely on the written contractual agreement. The pivotal distinction between an independent contractor and a "servant" is the amount of control the employer or contractee is entitled to exercise. *Id.* § 220 cmt. a. The more control exercised by the employer or contractee, the more likely the relationship is that of employer-employee. *Id.* Section 220 cmt. a. reads in relevant part,

> ... [A] servant is one who performs continuous service for another and who, as to his physical movements, is *subject to the control or to the right to control of the other as to the manner of performing the service.* The important distinction is between service in which the *actor's physical activities and his time are surrendered to the control of the master,* and *service under an agreement to accomplish results or to use care and skill in accomplishing results.* Those rendering service but *retaining control over the manner of doing it* are not servants. (Emphasis added).

*American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421 (3rd Cir. 1994), offers clarification on the nuance between control ex-

---

[7] Contract ¶¶ 7, 8.

ercised by an employer and the general guidance allowed by a contractee over an independent contractor, stating:

> If an employer assumes *the right to control the time, manner and method of executing the work*, as opposed to the *right to merely require certain definite results in conformity to the contract* a master-servant agency relationship has been created. If, however, the agent is not subject to that degree of physical control, but only subjected to general control and direction by the principal, the agent is termed an independent contractor. (Emphasis added).

Thus, the primary inquiry, is whether the amount of control exercised by IVM is significant enough to shift McPherson's contractual classification from independent contractor to servant.

In her deposition, McPherson stated that she had a supervisor provided by IVM named Steven (last name unknown at the time of deposition).[8] Upon further questioning, it was disclosed that Steven, her "supervisor" was not present in the booth to supervise the performance of her duties.[9] Contact between McPherson and Steven occurred mostly when she relieved Steven of his duty in the booth and when Steven delivered IVM's publications for McPherson's distribution.[10] Close scrutiny of the facts discloses that her direct supervision came from officials of Riise, namely Filippo Casinelli, co-owner of Riise and Edric Jones, facilities manager at Riise. McPherson regularly conferred with Mr. Filippo Casinelli who told her exactly which publications to distribute.

> So he would have somebody or if he was coming back from lunch or on his way in the office, he would tell me to stop by his office in the afternoon and he would tell me what he wanted distributed out of there, what he didn't. And basically A.H. Riise owns the booth, so . . .

(McPherson's Dep. 103:17-22). Further, McPherson informed IVM of the accident only after she informed Edric Jones and wrote down what she re-

---

[8] McPherson's Dep. 104:24-25.
[9] McPherson's Dep. 106:19-25.
[10] McPherson's Dep. 106-107.

membered per his request.[11] Additionally, the day after the accident Mr. Jones instructed McPherson to close the windows in a particular order.[12]

Although IVM may not have directly supervised McPherson, IVM did have a significant say in the performance of McPherson's duties. Specifically, IVM exerted control over the time, manner and method of McPherson's execution of the work. In fact, pursuant to the Contract, IVM designated the times McPherson reported to work,[13] IVM and Riise had complete control over what McPherson distributed,[14] and IVM directed McPherson to dress in an "appropriate, manner and maintain a proper appearance and demeanor"[15] per the Contract. IVM also directed McPherson to work exclusively out of the booth provided by Riise.[16] The only thing McPherson retained control over was her presentation and interaction with tourists and even then IVM mandated that she "direct foot traffic into A.H. Riise."[17] IVM also had the exclusive right to unilaterally change the rules, instructions or methods of performance referred to in the Contract.[18] In light of these circumstances, it is accurate to say that IVM's control over McPherson was such that it is difficult to determine what control, if any, McPherson was allowed to retain.

The RESTATEMENT (SECOND) OF AGENCY § 220 cmt. a. (1958), states that the "element" of control may be undermined if a particular job has customarily been viewed as a job done by a "servant" versus that of an independent contractor. Even if an agent has total control over the execution of a task, the agent would still be considered a servant/employee if the job is customarily considered a servant's job. *Id.*

Even though IVM claims McPherson was a "Barker" and independent contractor, the facts in this case do not support that contention. "Barkers" promote and advertise businesses on St. Thomas, primarily on Main Street. Many barkers promote smaller out of the way stores located on St. Thomas' Backstreet or down one of the obscure

---

[11] McPherson's Dep. 12, 58-59.
[12] McPherson's Dep. 13-14.
[13] The Contract ¶ 1.
[14] The Contract ¶ 1, McPherson's Dep. 102-103.
[15] The Contract ¶ 1.
[16] The Contract ¶ 1.
[17] The Contract ¶ 1.
[18] The Contract ¶ 4.

alleyways. Barkers are customarily considered independent contractors as they receive a commission for every tourist they deliver to a particular store and may even promote more than one store. Although barkers may give general information about the town of Charlotte Amalie, their main purpose is to herd tourists towards the businesses that hired them. McPherson's main duty while working in the Booth was distributing material provided by Riise and IVM.[19] In fact McPherson, in her own words, denied being a promoter for Riise, specifically saying, "I wasn't selling for them, but what I would do is if the store [the tourist asked about] was on Main Street, I would suggest that they walk through the alley to Main Street or walk through the air conditioned mall part, going through the liquor store." (McPherson's Dep. 115:18-25). She went on to say, ". . . I wasn't referring people to shop." (McPherson's Dep. 116:17-23). Further, when asked why she directed foot traffic through Riise, McPherson did not indicate that she was doing so pursuant to her contract. Instead, McPherson said she did it because she thought that in doing so she was helping IVM because Riise advertised in IVM's publications.[20] Moreover, the contract between Riise and IVM listed the duties of the person manning the booth as "to distribute advertisements, brochures, catalogs, and other literature to be supplied by Riise dealing with Riise Mall . . . direct foot traffic into Riise's stores; and provide general information to tourists and others, and to perform such other services as are from time to time agreed to between the parties."[21] The language of the contract itself maps out McPherson's main duty and purpose as disseminating publications and providing information to tourists. Directing foot traffic into Riise seems to have been a secondary priority. Finally, nothing in the Contract indicates that IVM agreed to provide a Barker to Riise. Although it may be true that Barkers are generally highly skilled, McPherson's job description did not indicate that the position required such high levels of expertise. Hence, McPherson's distribution of materials and dissemination of general information about Charlotte Amalie does not turn her into a barker.

■■■■ The Court must also examine whether the employer provides the instrumentalities, tools, and place of work. Webster's dictionary defines a

---

[19] McPherson's Dep. 19.

[20] McPherson's Dep. 116.

[21] The Contract ¶ 1.

tool as something (as an instrument or apparatus) used in performing an operation or necessary in the practice of a vocation or profession. An instrumentality is defined in Black's dictionary as a thing used to achieve an end or purpose or alternatively, a means or agency through which a function of another entity is accomplished, such as a branch of a governing body.

 IVM's argument that "the essential tools of a barker are his/her interpersonal marketing skills" is without merit because "interpersonal marketing skills" do not fall within either of the aforementioned meanings. Both IVM and Riise exclusively provided publications for distribution by McPherson.[22] The record also reflects that Riise is the incontrovertible owner of the Booth and IVM arguably had a possessory interest in the Booth where McPherson was required to work. Thus, in this case, the record clearly shows that IVM and Riise provided all McPherson's instrumentalities and tools in the form of publications, and Riise and IVM provided McPherson's place of work.

 IVM also argues that McPherson's limited time of employment and her payment on a per hour basis are both evidence pointing to McPherson being an independent contractor. However, contrary to this position the Restatement of Agency states:

> If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him. This is especially true if payment is to be made *by the job and not by the hour*. If, however, the work is not skilled, or if the employer supplies the instrumentalities, the workman may be found to be a servant.

RESTATEMENT (SECOND) OF AGENCY § 220 cmt. j. (1958) (Emphasis added). Comment of the Second Restatement of Agency also provides that a worker's "employment over a considerable period of time with regular hours"; "full time employment by one employer"; and "employment in a specific area or over a fixed route" should all be considered when making the distinction. *Id.* Here, McPherson contracted with IVM to provide services for a period of one year at a rate of $10 per hour with regular daily work

---

[22] The Contract ¶ 1.

hours.[23] A term of employment of one year may be considered long term employment and enough time for her to be considered a servant. Also, per comment j, had McPherson been paid by the job that would have been more indicative of her being an independent contractor. Her payment by the hour however, suggests that she is really a servant/employee. IVM's argument that "payment on an hourly basis is typical of many professions including attorneys and doctors" is not persuasive because payment on an hourly basis is also typical of many nonprofessionals including waiters and cashiers. Additionally, McPherson worked solely for IVM during the entire one year term of her contract, and worked at the same location, the Booth, for the entire duration of her contract.

 Another consideration is whether the person employed is engaged in a distinct occupation or business. The court touched on this issue during the hearing held on January 4, 2006, asking IVM's attorney whether they could provide evidence to show that McPherson was engaged in a distinct business. Specifically, the court asked whether IVM provided McPherson with a 1099 tax form and if she had a business license.[24] IVM did not give any indication that they provided McPherson with a 1099 tax form or that she had a business license. Additionally, IVM did not provide any indication that McPherson had other clients besides themselves.

 The final factor the court has taken into consideration is the parties' belief about the relationship they were creating. All of the aforementioned factors overwhelmingly indicate that McPherson was an employee of IVM and not an independent contractor. Since the Court has found that McPherson was an employee of IVM, IVM's contention that they cannot be held liable for McPherson's actions under § 414 of the Second Restatement of Torts is moot.

## B. The Staffing and Distribution Agreement between IVM and Riise created a lease and a sufficient possessory interest in the Booth for IVM to be held liable under a theory of premises liability.

 Plaintiff finally asserts that IVM had a sufficient possessory interest in the Booth to be held liable under a theory of premise liability.

---

[23] The Contract ¶ 2. 3.
[24] Tr. 41, January 4, 2006.

Throughout its argument and the original complaint Plaintiff alleges that IVM was alternately the lessor, lessee or owner of the Booth. Conversely IVM contends that the "Distribution and Staffing Agreement" between IVM and Riise did not create a lease agreement between IVM and Riise but rather "[only] an agreement to provide staff to Riise to operate its information booth." In order to resolve this issue the court must establish the nature of the relationship between IVM and Riise as it relates to the Booth.[25] Specifically, did the contract give IVM a possessory interest in the Booth? Further, if it did, was the interest that of a license or a lease?

 A landlord-tenant relationship is described at 49 AM. JUR. 2D *Landlord and Tenant* § 1 (2006), as an agreement or lease that is expressed or implied, whereby one party occupies and possesses the premises of another for some type of consideration, usually rent. The landlord-tenant relationship entitles the landlord to retain legal title to the property while *relinquishing physical possession of the property to the tenant. Id.* § 3 (Emphasis added). A landlord-tenant relationship is created when: (1) the landlord creates an estate in the tenant either at will or for a term less than what the landlord holds; (2) the landlord holds a reversionary interest in the property; (3) the landlord transfers exclusive possession and control of the property to the tenant, and (4) there is a (written) contract. *Id.* §§ 1, 20. The landlord-tenant relationship may be created by operation of law although no formal agreement was entered into. *Id.* § 1. Although consideration given in exchange for leased property is usually rent, a tenant may render services as well as tender payment in the form of rent as consideration for leasing property.[26] *Id.* §§ 7, 24; *See also, Dept of Natural Resources v. Bd. of Tr.s of Westminster Church of Detroit,* 114 Mich. App. 99, 318 N.W.2d 830 (Mich. Ct. App. 1982). The formal requirements of a lease are that it: (1) is in writing; (2) identifies the parties; (3) identifies the premises; (4) specifies the duration of the lease; (5) states the rent to be paid; and (6) is signed by the party(ies) to be charged. RESTATEMENT (SECOND) OF PROPERTY § 2.2 (1977).

---

[25] The denomination of an instrument as a "license" or a "lease" by the parties cannot alter or affect its true nature; it assumes its correct appellation by reason of the rights and obligations created by its terms under the law. 49 AM. JUR. 2D *Landlord ant Tenant* § 65 (2006).

[26] The fact that the rent is paid for in work does not preclude a landlord-tenant relationship. 49 AM. JUR. 2D *Landlord and Tenant* § 7 (2006).

 On the other hand, a license is an agreement allowing a party to use the land of another for a specific purpose, subject to the control and management of the owner. *Id.* § 20. Unlike a lease, a license does not convey any interest in land, is usually not assignable, and may be either created orally or by written contract. *Id.* For an agreement to qualify as a lease "[t]here must be a conveyance of a definite space . . . both the extension and the location of the space within the lessor's premises must be specified." *Id.* § 20. The distinction between a lease or license turns on whether the contractee was granted exclusive possession of the premises. *Id.* If the agreement does not grant exclusive possession, but rather permission to use the property subject to the owner's will then the agreement is a license. *Id.* § 20.

> The lessee's possession of the leased premises is essential to the character of a lease. To create a leasehold estate, the tenant must be vested with exclusive possession of the property to the lessee, even against the owner of the fee. In addition, there is authority for the view that although a person may be in possession of the premises, he or she is not a "lessee" unless he or she also has exclusive control of the premises.

*Id.* In the case of *Wandell v. Ross*, 241 Mo. App. 1189, 245 S.W.2d 689 (Mo. Ct. App. 1952), Plaintiffs who operated a hat checking service in Defendant's restaurant sued for the enforcement of a "lease" after Defendants barred them from the premises. The court found that despite the name given to the agreement, the Plaintiffs were actually in possession of a license and not a lease. *Id.* The court concluded that the critical distinction between a license and lease is that a license only allows for possession and occupancy of the land so far as is necessary to perform the act, and no further. *Id.* In coming to its conclusion, the court relied on the fact that the Plaintiffs only had access to the building and hat checking stand when Defendant owners opened the building and permitted access.[27] *Id.* at 689.

 The property owner's right to enter the premises for the purposes of maintenance does not detract from a tenant's right to exclusive possession. *Friend v. Gem Int'l*, 476 S.W.2d 134 (Mo. Ct. App. 1971). In *Friend*, the court stated:

---

[27] "Plaintiffs had no access to the building except at such times as defendants would open it for the purpose of carrying on their restaurant business." *Id.* at 689.

69

The fact that Gem employees entered the premises to clean the aisles and to determine the gross sales from the cash register does not destroy the concept of exclusive possession and control. Right of entry by the landlord to collect rent, for instance, is recognized in some jurisdictions and reservation of such right in the lease by the landlord or entry by the landlord to perform certain services can be accomplished with the consent of the tenant, without changing the status of landlord and tenant.

*Id.* at 134.

 In the case at bar, the agreement between IVM and Riise does not seem to be in the nature of a license but rather a lease because IVM was vested with the right to the exclusive possession of the Booth pursuant to the terms of the Agreement. Paragraph one (1) of the Agreement specifically states, "In return, Riise agrees to provide IVM with the *exclusive right* to use the Booth during the term of this Agreement . . ." This clause may be construed to mean that Riise granted IVM the right to use the Booth to the exclusion of all others, including themselves. Unlike *Wandell*, IVM had full access to the booth without Riise's interference as evidenced by the fact that either employees or independent contractors of IVM opened and closed the Booth.[28] This agreement may further be classified as a lease because IVM was allowed possession of the Booth for a definite amount of time, one year.[29] Further, as in *Friend*, the fact that Riise had access to the Booth in order to maintain it does not detract or diminish IVM's right to exclusive possession. Although Edric Jones, facilities manager at Riise, directed McPherson to close the Booth down in a certain manner after the accident, this alone is not enough to convert the agreement into a license. There is nothing in the Agreement that states that IVM was obligated to adhere to any conditions that Riise may have imposed concerning the Booth. Therefore, the Agreement between IVM and Riise *should not be* construed as a license.

---

[28] Steven, an employee of IVM, would open the Booth and McPherson would relieve him in the afternoon and close the Booth.

[29] A lease may also be distinguished from a license in that the term of a lease is limited to endure for a definite and ascertained period, however short or long the period may be. 49 AM. JUR. 2D *Landlord and Tenant* § 20 (2006).

■ The Staffing Agreement between IVM and Riise does however satisfy the requirements to create a landlord-tenant relationship. First, there was a written contract between IVM and Riise, namely the "Staffing Agreement". The Agreement stated that IVM had the right to exclusive possession of the Booth for the period of one (1) year.[30] Specifically, paragraph 2 of the Agreement states that the agreement "shall continue for a period of one (1) year from that date . . ." Riise, as landowner and possessor in fee had the right to possess the Booth. Riise through the Agreement conveyed a lesser portion of this right (1 year's worth) to IVM who then had the exclusive right to use the Booth during this limited time. Riise specifically and explicitly transferred exclusive possession and control of the property to IVM through the Staffing Agreement. Paragraph 1 of the Staffing Agreement states that ". . . Riise agrees to provide IVM with the *exclusive right to use the Booth*, during the term of this Agreement . . ." (Emphasis added). Reversionary interest in that possession of the Booth would immediately revert to Riise after the term of the contract expired. Clearly, all these factors taken together satisfy the substantive requirements of a landlord-tenant relationship.

■ In view of the fact that a writing was signed by representatives of both parties involved; the parties were clearly identified on the first page of the contract;[31] the premises were sufficiently identified in paragraph 1 of the contract as "the Booth" located on Riise's store property on the waterfront at Veterans Drive, St. Thomas, Virgin Islands; the lease's duration of one year was stated in paragraph 2 of the contract; and finally, the rent or consideration to be paid is spelled out in paragraph 1 of the Staffing Agreements,[32] a lease was created satisfied, establishing a landlord-tenant relationship between IVM and Riise.

---

[30] The Contract ¶ 2.

[31] . "Agreement made this 9th day of October, 2002, between International Voyager Media, Inc. . . . and A.H. Riise Gift Shop, Inc. . . . ."

[32] The contract reads in pertinent part,
IVM hereby agrees to cause the booth on Riise's store property on the waterfront . . . to be manned during the term of this Agreement . . . in order to distribute IVM's publication *What To Do St. Thomas*, as well as their other publication . . . In return, Riise agrees to provide IVM with the exclusive right to use the Booth during the term of this Agreement . . .

Paragraph five (5) of the contract further states,

IVM shall neither request nor receive compensation related to or for performance of the duties assumed by IVM under this Agreement other than the exclusive use [of] the Booth and

## C. This Motion *for* Summary *Judgment has no bearing on the cross-claim between* Riise *and* IVM.

Riise claims that its cross-claim against IVM to enforce the indemnity clause in its contract with IVM is in no way affected by this Motion for Summary Judgment. Riise has based its claim for indemnity on Paragraph nine (9) of the Staffing Agreement which reads,

> [International Voyager Media, Inc.] agrees to indemnify and hold Riise harmless from any and all actions which may be brought against Riise and/or Isidore Paiewonsky Associates, Inc. as a result of any action by the employees or independent contractors of [International Voyager Media, Inc.]

IVM counters by claiming it owes no duty to indemnify Riise under the contract because the accident was caused by a design defect in the Booth, saying specifically "evidence adduced in this case to date demonstrates that defects in the design of the kiosk led to the Plaintiffs injury."[33] Not only denying any duty to indemnify Riise, IVM claims that Riise has a duty to indemnify it, citing Paragraph ten (10) of the Staffing Agreement which reads in relevant part,

> Riise agrees to indemnify and hold IVM harmless from any and all actions which may be brought against IVM as a result of any action by the employees or independent contractors of Riise.

Summary Judgment may only be granted where there are no issues of material fact and where the issue may be reasonably resolved in favor of either party. Whether a defectively designed kiosk or the negligent actions of an employee of IVM led to the Plaintiff's injury is an issue of material fact that has to be left up to the jury. Therefore, this motion for summary judgment has no bearing on Riise's claim and IVM may still be held liable to Riise on the cross-claim.

## IV. CONCLUSION

To survive this motion, Plaintiff was required to produce facts demonstrating that McPherson was a servant/employee of IVM and not

---

the right to distribute therefrom such publication and material as set forth in Paragraph 1 herein.

[33] Defendant IVM's reply to Riise's Response to Defendant's Motion for Summary Judgment.

an independent contractor. Facts provided in the depositions and contracts taken in a light most favorable to the non-movant show McPherson was not an independent contractor and thus Plaintiff has met this burden. Moreover, IVM exercised sufficient control over McPherson by controlling the time, manner and method of McPherson's employment. Additionally, McPherson's job description is not analogous to that of a "barker" who is customarily considered in the Virgin Islands community as independent contractors. Not to be forgotten is the fact that IVM supplied the tools for McPherson's job while Riise supplied the place of work. Hence sufficient indicia was presented to defeat the notion that McPherson was an independent contractor notwithstanding the words of the contract.

Plaintiff was also successful in demonstrating that IVM held a sufficient possessory interest in the kiosk to be held liable under premises liability since the Staffing Agreement between IVM and Riise effectively created a lease between the two parties. Accordingly, the Court finds that Defendant IVM has not met the legal burden for a grant of Summary Judgment thus Defendant's Motion for Summary Judgment is denied.